**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Robert Vito COMITO, Defendant–Appellant.**

No. 98–10202.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 12, 1999.

Filed May 27, 1999.

Timothy P. O'Toole, Assistant Federal Public Defender, Las Vegas, Nevada, for the defendant-appellant.

Robert A. Bork, Assistant United States Attorney, Las Vegas, Nevada, for the plaintiff-appellee.

Before: SCHROEDER, REINHARDT, and SILVERMAN, Circuit Judges.

REINHARDT, Circuit Judge:

Robert Vito Comito appeals one of the district court's findings of a violation of the terms of his supervised release, as well as his sentence, which was based in part on the disputed violation. He does not challenge the revocation itself, because he concedes that three uncontested minor violations are legally sufficient to support that action. Because we hold that Comito's due process right to confrontation was violated with respect to the disputed violation, we reverse and remand with respect to that violation and the sentence.

## I.

In 1992, Comito pled guilty to one count of cocaine distribution and was sentenced to sixty-three months' imprisonment and six years of supervised release. A year and a half after he completed serving his prison sentence, the district court revoked Comito's supervised release, finding four separate violations of the conditions of his release: the unauthorized use of his former girlfriend's bank cards, credit cards and checks (a "grade B violation") and three lesser violations ("grade Cs").

At the revocation hearing, Comito admitted the grade C violations, but contested the grade B violation. He acknowledged using Deirdre Connell's cards and checks, but contended that he had done so with her permission, and that any unauthorized charges were made by someone else. Comito concedes that the three admitted grade C violations support revocation of his supervised release, but argues persuasively that because they constitute a lower grade of violation than the alleged fraud, the finding of the fraud violation led to imposition of a far longer sentence. Comito was sentenced to thirty months' imprisonment for his violations of the conditions of supervised release. The recommended sentencing range for the grade C violations under the Sentencing Guidelines' Chapter 7 policy statements was seven to thirteen months.[1] *See Williams v. United States,* 503 U.S. 193, 200–01, 112 S.Ct. 1112, 117 L.Ed.2d 341 (1992) (Sentencing Guidelines' policy statements are authoritative guides); *United States v. Plunkett,* 94 F.3d 517, 518 (9th Cir.1996) (Chapter 7 policy statements are binding on federal courts).

---

1. In sentencing Comito, the district court exceeded the Sentencing Guidelines' range for a grade B violation (18–24 months). Comito also appeals this upward departure as a violation of his due process rights. Because of our conclusion that Comito's due process rights were violated in the finding of the grade B violation, we do not reach the sentencing issue. We note, however, that an upward departure is improper absent adequate notice and justification. *See United States v. Hinojosa–Gonzalez,* 142 F.3d 1122, 1123 (9th Cir. 1998).

The crux of the alleged fraud violation was the accusation made by Deirdre Connell, Comito's former girlfriend and roommate, to Comito's probation officer, Officer Perdue, that Comito had used her bank cards, credit cards and checks without her permission. Connell was not present to testify at the initial revocation hearing. Because her evidence was expected to be critical to the determination of that violation, the district court granted a continuance so that the government could subpoena her. However, Connell still was not present at the continued hearing. At the beginning of the hearing, counsel for the government stated his intent to offer the testimony of Officer Perdue regarding what Connell had said to him concerning Comito's use of her cards and checks. Comito's lawyer strenuously objected to the use of this hearsay testimony to prove the violation and forcefully asserted that its admission would violate his client's confrontation rights.

The court asked counsel about the circumstances surrounding Connell's absence. The Assistant United States Attorney said that the Government had been unsuccessful in its attempt to subpoena her. He alleged, based on information given to him by Comito's probation officer, that Connell was afraid that she would be harmed by an unknown associate of Comito's should she testify. Comito's counsel, on the other hand, stated that he had personally spoken to Connell as recently as half an hour prior to the hearing, during which conversation she had told him that the only reason she had made the allegations was because her romantic relationship with Comito had soured at the time, that she would not repeat the allegations at the hearing, and that her reluctance to testify was due to fear of perjury charges or other repercussions should she change her story. Moreover, Comito's counsel stressed that, to the best of his knowledge, Connell was not afraid of his client, pointing to her almost daily visits and telephone calls to Comito at the Detention Center. After hearing from counsel on this issue, the District Judge stated that his "inclination would be to see what is said and what kind of foundation is laid, but clearly, . . . hearsay can be considered and it would—if this were the only violation of the defendant it might be different, but this defendant, if what has been alleged is true, has a lot of problems." [2]

Officer Perdue then testified to what Connell had told him about the alleged fraud. According to Officer Perdue, Connell contacted him in early January 1998, and told him that a number of unauthorized transactions had occurred involving several of her credit cards and bank accounts in December 1997 and that in her opinion Comito was responsible for all of them. Perdue said that Connell accused Comito and an unknown associate of taking her credit cards from her wallet and using and then replacing them, and also claimed that checkbooks from two different bank accounts had been stolen, and checks had been forged and sent to her credit card companies to cover some of the unauthorized transactions. He did not testify as to any efforts to secure Connell's presence, provide any explanation for her absence, or iterate the statements attributed to him earlier in the proceeding by counsel for the Government.

In addition to Officer Perdue's testimony regarding Connell's allegations, the government offered four other pieces of evidence concerning the transactions, which to varying degrees provided corroboration for certain aspects of the charge, but which collectively fell far short of the quantum of proof required to support a finding of the charged violation. This evidence consisted of: stipulated testimony of a Las Vegas Police Detective that Connell

---

**2.** The other problems were apparently the three grade C violations. They consisted of the following: using a condominium and mailbox owned by his mother and brother without their permission; failing to give truthful answers to inquiries by his probation officer and to follow his probation officer's instructions; and failing to provide accurate employment and address information to his probation officer.

had reported unauthorized bank card transactions, that no charges had been filed, and that the case remained open;[3] a memorandum written by Connell, apparently at Officer Perdue's request, listing the dates and amounts of the transactions in question;[4] several of Comito's unemployment compensation documents and his December 1997 bank statement; and, Officer Perdue's testimony regarding his discussion with a credit card fraud investigator about the investigator's conversations with Connell and Comito. While the additional evidence may also be subject in whole or in part to valid objections based on hearsay and Comito's right to confrontation, those challenges are not raised before us. Only Officer Perdue's testimony regarding what Connell purportedly told him is at issue in this appeal.

Before Comito took the stand to contest the fraud allegation, his counsel requested a further continuance so that Connell could be present. The District Judge denied this request. Comito then testified to the following: Throughout his relationship with Connell, each had used the other's credit cards, and Connell had given him her ATM PIN number so that he could have access to her bank accounts. Toward the end of 1997 Connell noticed that one of her credit cards was missing, and he believed she had lost it in a move a few months earlier. In early January of 1998, he moved out of the house he shared with Connell because they were not getting along, and moved in with another woman. Shortly thereafter, he became aware of Connell's concerns regarding unexpectedly large charges on her credit cards and some missing checks. While he did make some purchases with Connell's credit cards during December, he had her (at least tacit) consent for these transactions, he took responsibility for these charges, and he was not responsible for the other

charges or the missing checks. Other individuals, who had used Connell's cards in the past, may have had access to those cards. Following his arrest for the alleged supervised release violations, he and Connell had a reconciliation, and she then told him that she was sorry that she had made the accusations and would withdraw them. She also told him that the unauthorized charges were "still on-going" and that as he was then in jail, she knew that he was not the guilty party. As part of their reconciliation, he and Connell agreed to try to pay off her debts together, as he "felt kind of partly responsible ... because [of the possibility that] it was indeed anybody that [he] knew that used her cards or stole her checks." The conversation with the credit investigator, to which Officer Perdue referred, was in accordance with that agreement.

Following Comito's testimony, his counsel made a brief closing argument reiterating his objections to the hearsay evidence, reasserting his client's constitutional right to confrontation, and asking the court to find that only the grade C violations had been committed. Without ruling specifically on the admissibility of Officer Perdue's hearsay testimony or explaining the basis for his findings, the district court found that Comito had committed all four of the violations of supervised release alleged in Perdue's Revocation Petition. Then, without explanation or reference to the Sentencing Commission's Guidelines, the court sentenced Comito to thirty months.[5]

## II.

Comito challenges the district court's reliance on Officer Perdue's hearsay testimony to establish the fraud violation—the testimony regarding Connell's

---

3. Defense counsel stipulated to this testimony with the caveat that Comito's hearsay objections were not waived.

4. This document was admitted into evidence over defense objection.

5. It is uncontested that Comito's proper criminal history category is V. The Guidelines' range for grade C offenses for this criminal history category is 7–13 months; for grade B violations, 18–24 months. U.S.S.C. Guidelines § 7B1.4(a).

verbal statements—and contends that he was denied his due process right to confrontation. In *Morrissey v. Brewer*, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972), the Supreme Court defined certain minimum due process requirements for parole revocation, which have since been extended to the revocation of probation, *see Gagnon v. Scarpelli*, 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973), and the revocation of supervised release, *see* Fed. R.Crim.P. 32.1. Under *Morrissey*, every releasee is guaranteed the right to confront and cross-examine adverse witnesses at a revocation hearing, unless the government shows good cause for not producing the witnesses. 408 U.S. at 489; *see also* Fed.R.Crim.P. 32.1(a)(2)(D) ("opportunity to question adverse witnesses"). This right to confrontation ensures that a finding of a supervised release violation will be based on verified facts. *See Morrissey*, 408 U.S. at 484. Accordingly, in determining whether the admission of hearsay evidence violates the releasee's right to confrontation in a particular case, the court must weigh the releasee's interest in his constitutionally guaranteed right to confrontation against the Government's good cause for denying it. *See United States v. Walker*, 117 F.3d 417, 420 (9th Cir.1997) (citations omitted).

▬ In the present case, the district court failed to conduct the requisite due process balancing test, or even to rule directly on the admissibility of Officer Perdue's hearsay testimony, despite that fact that at the inception of the revocation hearing the parties had accurately described the balancing test to the court. Although the judge initially stated that he would hear the disputed hearsay testimony and then rule on its admissibility, he did not clearly make a further ruling on Comito's due process objections. Because the hearsay testimony was presented and be-

cause the district judge simply found without explanation or comment that the alleged violation had occurred, we assume that the evidence was admitted. We assume this, also, because there was insufficient evidence to support a finding of the charged violation in the absence of Officer Perdue's testimony, and the Government does not contend otherwise. However, while the district court's failure to perform the balancing test was erroneous, that error is not necessarily fatal. We still must review the underlying question to determine if Comito's confrontation rights were violated, and, if so, whether the violation was harmless beyond a reasonable doubt. *See United States v. Vargas*, 933 F.2d 701, 704–05 (9th Cir.1991).[6]

This court has previously applied the balancing test in two cases. We have considered whether the rights of supervised releasees in revocation proceedings were violated by (1) the admission of a probation officer's testimony regarding the content of records maintained by another probation officer and (2) the admission of urinalysis test results without any opportunity for the releasee to retest the urine samples. *See Walker*, 117 F.3d at 420–21 (holding that releasee's right to confrontation was not violated by the admission of a probation officer's testimony regarding the content of official records maintained by another probation officer, because the releasee did not dispute either the substance or the reliability of the hearsay testimony); *United States v. Martin*, 984 F.2d 308, 309–10 (9th Cir.1993) (holding that the releasee's right to confrontation was violated where he was convicted of possession of a controlled substance based solely on the hearsay evidence set forth in the results of two urinalysis examinations). We have not previously considered whether a releasee's right to confrontation may be outweighed where the adverse hearsay testimony con-

---

**6.** The District Judge did reject Comito's hearsay objections to the admission of a report by a detective regarding a complaint made by Connell. Even were we to treat that ruling as being general in nature and thus applicable to Perdue's testimony also, our analysis would

not change. As to the balancing test, when determining that the detective's report would be admitted, the court noted that the testimony was important but, mistakenly, appeared to consider this as a factor mitigating in favor of its admission rather than its exclusion.

sists of a witness reporting another person's unsworn verbal statements—in this case, the statements of the victim of the offense which constitutes the releasee's alleged violation. It is in this context that we must now apply the balancing test.

■ First, we must assess the significance of the releasee's interest in the right to confrontation. As we have previously stated, although every releasee has the right to confrontation, this right is not static, but is of greater or lesser significance depending on the circumstances. *Martin*, 984 F.2d at 310–11. The weight to be given the right to confrontation in a particular case depends on two primary factors: the importance of the hearsay evidence to the court's ultimate finding and the nature of the facts to be proven by the hearsay evidence.[7] *See id.* at 311. As the *Martin* court emphasized, "[t]he more significant particular evidence is to a finding, the more important it is that the releasee be given an opportunity to demonstrate that the proffered evidence does not reflect 'verified fact.' " *Id.* So, too, the more subject to question the accuracy and reliability of the proffered evidence, the greater the releasee's interest in testing it by exercising his right to confrontation.

■ Here, the hearsay testimony was, indisputably, important to the finding of the violation. Comito was charged with using Connell's credit cards and checks without her permission; he admitted to using the financial instruments, but testified that he had her authorization to do so. Thus, the contested element of the violation was whether Connell authorized Comito to use her cards and checks. The hearsay testimony consisted of the alleged victim's purported statements regarding that critical question: Officer Perdue testified as to what Connell told him regarding her consent or lack of consent to the use

by Comito of her cards and checks. Thus, Comito had a very strong interest in demonstrating that the hearsay testimony did not reflect "verified fact."

Comito's interest in confronting Connell directly was further strengthened by the nature of the disputed hearsay evidence. Unsworn verbal allegations are, in general, the least reliable type of hearsay, and the particular utterances at issue here bore no particular indicia of reliability. Unlike in *Martin*, where the disputed hearsay involved urinalysis reports, which, as regular reports of a company whose business is to conduct such tests, are due a certain weight, 984 F.2d at 314, or in *Walker*, which involved the official records of a probation officer, 117 F.3d at 421, the hearsay here was not inherently reliable. Connell's statements were not made under oath, or in any other context that might lend them credence. Rather, shortly after their romantic relationship ended, Connell, the releasee's ex-girlfriend, called Officer Perdue and accused her then-former lover of using her cards and checks. *Compare United States v. Fennell*, 65 F.3d 812, 813–14 (10th Cir.1995) (unsworn allegations made by defendant's former girlfriend to probation officer during a telephone interview lack even minimal indicia of reliability); *see also United States v. Huckins*, 53 F.3d 276, 279 (9th Cir.1995) (hearsay evidence did not have minimal indicia of reliability required for admission at sentencing where it consisted of unsworn statements made by accomplice in the course of plea negotiations with the government). In addition, the hearsay testimony related to facts of which only Connell and Comito had direct knowledge.

Because the hearsay evidence was important to the court's finding, and because it involved the least reliable form of hearsay, Comito's interest in asserting his right to confrontation is at its apogee. We now

7. These two factors, although always important, are by no means exhaustive. In other circumstances, other factors may be relevant. For example, in *Martin*, we also looked to the consequences of the court's findings, because, in that case, the court's finding, based on the hearsay evidence, that Martin possessed a controlled substance, triggered application of a statutory mandatory minimum sentence, thus divesting the court of sentencing discretion. 984 F.2d at 312.

examine the good cause offered by the Government for denying Comito that right.

██ The reasons that may constitute good cause for denying a releasee his right to confrontation in a revocation hearing vary, of course, depending on the specific circumstances. Whether a particular reason is sufficient cause to outweigh the right to confrontation will depend on the strength of the reason in relation to the significance of the releasee's right. In some instances, mere inconvenience or expense may be enough; in others, much more will be required. *See Martin*, 984 F.2d at 312. Here, the Assistant United States Attorney claimed that the Government was unable to subpoena Connell and that she was unwilling to testify because she was afraid of Comito (or an unknown associate of his). We need not decide whether or under what circumstances a fear for one's own safety or that of a family member might justify the use of hearsay testimony in a revocation proceeding. In this case, the government offered no evidence of any such fear on the part of the absent witness, despite the fact that the probation officer who had spoken with her and who, the Assistant United States Attorney said, had made an effort to subpoena her, was the primary witness at the hearing; and despite the fact that the officer presented the critical hearsay testimony regarding what Connell told him about the events that underlay the charges.

Counsel for the Government never asked Officer Perdue during the course of his testimony about Connell's reasons for not appearing, about anything she told him regarding that question, or even about any effort he may have made to subpoena her. Nor did the Government offer evidence of any kind regarding Connell's fear of Comito.[8] This despite (or perhaps because of) representations by Comito's counsel that Connell visited and called Comito in jail almost daily, and that only a half hour before the hearing Connell had told him that she was afraid not of Comito but rather of causing legal trouble for herself if she appeared at the hearing and repudiated the story she had told Officer Perdue. Thus, no cause has been shown for denying Comito his confrontation rights—there is nothing at all to put on the Government's side of the scale.

The Government also argues that, even absent a showing of difficulty in obtaining Connell's testimony, the hearsay evidence bears sufficient indicia of reliability, by virtue of the other testimony and evidence presented at the hearing, to make it admissible. Given the substantial nature of Comito's interest in confrontation and the absence of good cause for the Government's failure to produce the adverse witness, the supporting or corroborative evidence noted by the Government cannot suffice to deprive Comito of his constitutional right to confrontation.[9]

---

**8.** The Government counsel did, however, ask Officer Perdue one question that elicited the following information: Prior to the date on which Connell and Comito allegedly reconciled, in fact at Comito's initial hearing on Connell's charges, Comito was brought into court, in chains. When he saw Connell in the back of the courtroom, he took four steps in her direction and yelled "Bitch."

**9.** Our review of the record shows that, in fact, the additional evidence is not particularly persuasive. That evidence consists of the memorandum Connell submitted to Officer Perdue regarding the unauthorized transactions, the stipulated testimony of Detective Olewinski regarding Connell's police report, the testimony of Officer Perdue regarding the statements of the credit investigator, and Comito's finan-

cial documents. Connell's memorandum was hearsay; it was not a sworn statement submitted to the court. The stipulated testimony of Officer Olewinski, that Connell had made a complaint to the police and that no action had been taken regarding her complaint, is more hearsay, to the extent that it is offered to prove the truth of Connell's allegations. Officer Perdue's testimony about his conversation with the credit investigator suffers from the same defect, doubled. Thus, the weight to be given all of the above evidence is limited. Finally, the financial records presented do show that, while Comito had no obvious source of income, he was nonetheless making large deposits in his bank account. Considering these records together with Connell's memorandum, one could infer that the deposits correlated with withdrawals of cash from

The balancing test itself has shown not only that the denial of Comito's right to confrontation was erroneous, but that the error was not harmless beyond a reasonable doubt. Accordingly, we reverse and remand for further proceedings consistent with this disposition. Because Comito has now served over thirteen months, the outer limit of the Sentencing Guidelines' range for the grade C violations of the conditions of his supervised release, we direct that the mandate issue forthwith.

REVERSED AND REMANDED FOR PROCEEDINGS CONSISTENT WITH THIS OPINION.

Connell's accounts; however, this, too, fails to shed light on whether these withdrawals and deposits were made with or without Connell's consent.

In addition, some of the evidence offered at the hearing, such as Comito's knowledge of Connell's PIN and the photograph of another individual using Connell's ATM card, pointed to the conclusion that Comito was not responsible for the unauthorized charges, thus further calling into question the reliability of the hearsay evidence.