Wilbur ASH, Petitioner,

v.

Edward F. REILLY, Jr., Cranson J. Mitchell, John Simpson, In their official capacities as Commissioners of the United States Parole Commission Odie Washington, In his official capacity as Director of the District of Columbia Department of Corrections Fred Figueroa, In his official capacity as Warden of the Correctional Treatment Facility Respondents.

No. CIV.A.03–2007(AK).

United States District Court, District of Columbia.

May 5, 2006.

Olinda Moyd, Catharine F. Easterly, Timothy Patrick O'Toole, Public Defender Service for the District of Columbia, Washington, DC, for Petitioner.

Daniel M. Cisin, Margaret J. Chriss, U.S. Attorney's Office, Washington, DC, for Respondents.

### MEMORANDUM OPINION

KAY, United States Magistrate Judge.

Pending before the Court is Petitioner Wilbur Ash's Petition for *habeas* relief, remanded to this Court for consideration in light of *Crawford v. Jackson,* 323 F.3d 123 (D.C.Cir.2003). *See Ash v. Reilly,* 431 F.3d 826, 831 (D.C.Cir.2005). Upon consideration of the parties' thorough briefing and oral argument, Ash's petition is hereby **GRANTED.**

### *Procedural and Factual Background*

On March 3, 1995, Wilbur Ash was sentenced in the Superior Court for the District of Columbia to 5–to–15 years for possession with intent to distribute cocaine.

On March 8, 2001, Mr. Ash was released on parole. While on parole, Ash stayed clean, reported regularly, and "never gave [his parole officer] any problems." (A. at 73.)[1] He worked as a stock person at the Stop, Shop and Save in Baltimore, and frequently took his mother to her dialysis appointments. (*Id.* at 70.) On April 4, 2002, Ash was charged in Baltimore, Maryland with attempted murder, assault in the first and second degree, and carrying a dangerous and deadly weapon. (1st Am. *Habeas* Pet. at 4.)

The charges against Ash arose from a "cutting" that occurred on April 1, 2002. (A. at 10.) The two victims were Jerome Simms and Anthony Gardner. According to the Commission's theory of the case, Ash and Simms got into a disagreement over Earline Gardner, who may have been romantically linked to one or both of the men. (*Id.* at 10–11.) According to the Commission, the disagreement escalated into an altercation in which Ash attacked Simms with the box cutter that he used in his job as a stock person. (*Id.*) As the Commission describes the incident, Anthony Gardner and another man, Edwin Davis, tried to separate the two men, and Gardner's hand was cut in the process. (*Id.* at 11, 57–58.) Simms' injuries were severe, including deep and gaping wounds on his back and face. (*Id.* at 17.) The slash wounds on Simms' back stretched approximately 40 cm across and cut deep into the muscle. (*Id.*) Gardner had a deep cut to his right hand. (*Id.* at 11.)

The criminal case went to trial and at the close of the state's case the Circuit Court for Baltimore City granted Ash a judgment of acquittal and dismissed all of the charges against him. (*Id.* at 21.) Immediately upon Ash's acquittal and release,

the Parole Commission detained Ash for alleged violations of his parole. (*Id.* at 26.) The Commission held a probable cause hearing on June 20, 2003, at which time the hearing examiner made a no probable cause finding on the technical violations and the attempted murder charge, but found probable cause with regard to the assault counts. (*Id.* at 28–29.)

At the probable cause hearing, the Commission provided Ash with Officer Shepke's preliminary police report and Jerome Simms' medical records. (*Id.* at 10–18.) The Commission listed Officer Shepke and Ash's parole officer Mohammed Gassama as the adverse witnesses it planned to call. (*Id.* at 30.) The Commission also informed Ash of his right to confront adverse witnesses. (*Id.*) Ash indicated that he wished to exercise his confrontation rights and asked the Commission to present Simms. (*Id.*) The Commission approved Simms as an adverse witness and subpoenaed him to appear at the revocation hearing. (*Id.*)

At the August 13, 2003 parole revocation hearing, Officer Shepke, the author of the police incident report, appeared as the sole witness to testify against Ash for the Commission. Officer Shepke conceded, however, that he had no personal knowledge of the incident. (*Id.* at 52–54, 58–59.) Rather, to the extent Shepke testified about the assault, the circumstances surrounding it and the identification of Ash as the alleged perpetrator, his testimony consisted entirely of unsworn verbal hearsay statements by various individuals at the scene. (*Id.* at 48, 49–50, 51, 53–54, 56, 57–58.) Mohammed Gassama, Ash's Court Supervision Officer, testified that Ash reported regularly, had never tested positive for drugs, and was "a nice person" who "never

---

1. For clarity and ease of reference, the Court will cite to the appellate record where applicable. The entire appellate record was attached as Exhibit 1 to Petitioner's Brief on Remand.

gave [him] any problems." (*Id.* at 73.) Jerome Simms, the victim and complainant, whom the Commission had subpoenaed on behalf of Ash to satisfy his confrontation rights, did not appear. (*Id.* at 37.)

When Simms did not appear at the outset of the revocation hearing, Ash objected to proceeding without either Simms or at least some other witness with personal knowledge of the incident, as a violation of Ash's right to confront and cross-examine adverse witnesses. (*Id.* at 38–39.) The hearing officer deferred ruling on Ash's request for a continuance until after Officer Shepke's testimony and sent someone to try and find Simms in the meantime. (*Id.* at 39–40.) Ultimately, Simms never showed and the hearing officer refused to continue the hearing, over Ash's objections. (*Id.* at 69–70, 75, 77.) Despite repeatedly assuring Ash that the Commission was attempting to locate Simms, the hearing officer decided, at the end of the hearing, that Simms was not an adverse witness after all. (*Id.* at 77.) The hearing officer failed to articulate a good cause basis to justify denying Ash the opportunity to confront and cross-examine adverse witnesses, nor did he offer a reason for refusing to continue the hearing in order to locate Simms.

At the revocation hearing, Officer Shepke testified that around noon on April 1, 2002, police received a call for a "cutting" at 529 East 27th Street in Baltimore, Maryland. (*Id.* at 48.) Officer Shepke and Officer Valerio were the first to arrive on the scene. Officer Shepke testified that he had no personal knowledge of what had happened, (*id.* at 52–54, 58–59), but that when he arrived, he saw several people standing out in front of the address, pointing in the street and screaming "that that was him," (*id.* at 48). He looked down the street, saw a man (Ash) running and

chased after him. (*Id.*) Shepke also testified that he saw Ash make a throwing motion and apparently toss an object over a fence, (*id.* at 49), although the police report indicates that only Officer Valerio saw Ash make the throwing motion, (*id.* at 10). After the Petitioner was apprehended, other officers who had subsequently arrived on the scene retrieved a box cutter from the vicinity. (*Id.*) The crime lab subsequently came to the scene, photographed the box cutter and may have conducted additional forensic testing. (*Id.* at 11.) However, the Commission did not submit any physical evidence linking Ash to the assault.

Shepke apprehended Ash and returned him to the scene, where, according to the police report, Ash "was quickly identified by witnesses as the suspect in the cutting." (*Id.* at 10.) Shepke could not remember the names of the individuals who allegedly identified Ash, (*id.* at 53), and was unsure about their number, but believed there may have been "4 or 5," (*id.* at 54). Officer Shepke did not write up any statements from any of the unidentified individuals because "they were taken in and interviewed by [other] detectives." (*Id.*)

At some point, Officer Shepke left the scene and went to the hospital where Anthony Gardner was being treated. (*Id.* at 55.) At the hospital, Gardner provided Shepke with a more detailed description of the incident. (*Id.* at 57–58.) Gardner told Shepke that there had been some kind of altercation between Simms and Ash. (*Id.*) Gardner claimed that he saw Ash "make a slashing motion across Mr. Simms' back," and that he tried to break up the fight and only to get his hand cut in the process. (*Id.* at 58.)

Officer Shepke's police report was also offered as evidence against Ash. (*See id.* at 10–11.) Although the report is more de-

tailed that Officer Shepke's testimony in some respects, the hearsay in the police report is largely repetitive of the hearsay statements in Officer Shepke's direct testimony. The report does at least list the names of some of the individuals present at the scene whose names Shepke could not remember and who were apparently interviewed by other detectives.[2] (*Id.* at 10.) However, the report fails to attribute the various hearsay statements to the particular individuals named in the report.

Simms' medical records were also offered as evidence against Ash. The medical records describe large, "gaping" slash wounds that could be consistent with injuries inflicted by a box cutter or a much larger weapon. (*Id.* at 17.) According to the medical records, Simms "sustained multiple large slash wounds with a machete to his right face, right neck, and across his back." (*Id.*) One of the wounds extended "approximately 40 cm" across Simms' entire back. (*Id.*)

The hearing officer found against Ash on all counts and recommended that he be incarcerated until the expiration of his sentence, approximately 102 months. (*Id.* at 87–91.) The Commission revoked Ash's parole on September 4, 2003 and sentenced him as recommended. (*Id.* at 92.) In describing the basis for his decision, the hearing officer relied heavily on the hearsay statements identifying Ash as the perpetrator. (*Id.* at 90–91.) The hearing officer placed particular emphasis on Gardner's statements describing the incident. (*Id.* at 91.) The hearing officer agreed that Ash did not seem to be a violent person, but thought, based on Shepke's testimony about Gardner's description of the incident and the romantic relationships among the parties, that it was a situation

that "escalated" and "got out of control." (*Id.* at 91.)

On September 26, 2003, Ash filed a petition for a writ of habeas corpus, which this Court granted, on the grounds that *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), which requires confrontation for testimonial hearsay, regardless of its indicia of reliability, was applicable to parole revocation hearings. *See Ash v. Reilly,* 354 F.Supp.2d 1, 6–9 (D.D.C.2004), *recons. denied,* 354 F.Supp.2d 11, 12 (D.D.C.2005). The Circuit reversed and remanded Ash's *habeas* petition for consideration under *Crawford v. Jackson,* 323 F.3d 123 (D.C.Cir.2003), which conditions a parolee's confrontation rights on the reliability of the hearsay evidence used against him in the revocation hearing. *See Ash v. Reilly,* 431 F.3d 826, 831 (D.C.Cir.2005). The parties submitted briefs on remand and the Court held a hearing on Feb. 16, 2006.

### Analysis

*I. Confrontation in Parole Revocation Hearings*

 In *Morrissey v. Brewer,* 408 U.S. 471, 488–89, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972) the Supreme Court held that while not intended to be the duplicate of a criminal trial, a parole revocation hearing does grant a parolee a right to confrontation under certain circumstances. A parolee has "the right to confront and cross examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation)." *Morrissey,* 408 U.S. at 489, 92 S.Ct. 2593. This right to confrontation is one of the "minimum requirements of due process" to which parolees are entitled in a revocation hearing, including as well, notice of the claims and evidence against the parolee, an opportuni-

---

**2.** Several of the individuals listed on the police report were also listed as witnesses in the

criminal trial in which Ash was granted a judgment of acquittal. (*See* A. at 10, 23.)

ty to be heard in person and to present witnesses and documentary evidence, and a "neutral and detached" decision maker. *Id.* These fundamentals of due process are not intended to replicate the full panoply of rights to which a defendant is entitled in a criminal trial, but are rather "[t]he few basic requirements," *id.* at 490, 92 S.Ct. 2593, laid out by the Supreme Court to ensure that a decision to deprive someone of his liberty is not made arbitrarily but rather based on "verified facts" and "accurate knowledge," *id.* at 484, 92 S.Ct. 2593.

 Over the years, Courts applying *Morrissey,* including this Circuit, have evolved a balancing test to determine when this qualified right to confrontation is triggered. Under this balancing test, whether the Commission impermissibly denied a parolee the right to confront adverse witnesses depends on the parolee's need for confrontation as weighed against the Commission's reasons for not producing adverse witnesses.[3] *See Crawford v. Jackson,* 323 F.3d 123, 129 (D.C.Cir.2003) (approving balancing test in use by other circuits to assess use of hearsay evidence in parole revocation hearings); *United States v. Stanfield,* 360 F.3d 1346, 1359–60 (D.C.Cir.2004) (approving balancing test); *United States v. Bell,* 785 F.2d 640, 642–43 (8th Cir.1986); *compare United States v. Comito,* 177 F.3d 1166, 1171 (9th Cir.1999) (applying balancing test and finding right to confrontation when unsworn verbal allegations were important to the revocation decision), *cited with approval in Jackson,* 323 F.3d at 129, *and United States v. Taveras,* 380 F.3d 532, 536–38 (1st Cir. 2004) (confrontation required when unsworn verbal allegations critical to revocation decision), *with United States v. Kindred,* 918 F.2d 485, 486–87 (5th Cir.1990) (finding no right to confront author of reliable urinalysis report made in regular course of business), *and United States v. Penn,* 721 F.2d 762, 764–66 (11th Cir.1983) (same).

 As Petitioner rightly notes, "every piece of hearsay evidence will not trigger the right to confrontation." (Pet'r Br. at 2.) Rather, the evidence must lack traditional indicia of reliability and must be sufficiently important to the Commission's case such that the parolee is prejudiced by the lack of confrontation. *See Ash,* 431 F.3d at 830 (noting that "[w]hether a witness's absence is prejudicial depends on the quality and quantity of nonhearsay and the reliable hearsay evidence supporting the decision to revoke parole"); *Stanfield,* 360 F.3d at 1360 (finding district court's

---

**3.** In parole revocation proceedings generally, a decision to revoke parole violates due process only if it is "either totally lacking in evidentiary support or . . . so irrational as to be fundamentally unfair." *See Ash,* 431 F.3d at 830 (internal citations omitted). The Circuit first articulated this standard in *Duckett v. Quick,* 282 F.3d 844, 847 (D.C.Cir.2002), but later clarified its application to the use of hearsay evidence in parole revocation proceedings in *Crawford v. Jackson,* 323 F.3d 123, 129 (D.C.Cir.2003). In *Jackson,* the Circuit explicitly held that "in the context of hearsay evidence" in a parole revocation proceeding, the *Duckett* standard was indistinguishable from the balancing test applied by other Circuits. *See Jackson,* 323 F.3d at 129. Thus, in this Circuit, a parole authority's reliance on hearsay is fundamentally unfair, i.e., it states a due process violation, when the hearsay relied upon is both unreliable and sufficiently important to the decision such that the parolee is prejudiced by the lack of confrontation. *See Jackson,* 323 F.3d at 129 (adopting balancing test in use in other circuits and expressing concern that hearsay used in parole revocation proceedings should bear "sufficient indicia of reliability" to protect parolee's due process rights); *United States v. Stanfield,* 360 F.3d 1346, 1359–60 (D.C.Cir.2004) (finding district court erred in failing to conduct balancing test, but error was ultimately harmless; hearsay was duplicative of evidence already in the record without objection).

failure to conduct balancing test was harmless error; probation officer's hearsay testimony was largely repetitive of evidence already admitted into the record without objection); *Comito*, 177 F.3d at 1171 (right to confrontation depends both on reliability of the particular evidence and its significance to the decision to revoke parole).

This balancing test is intended to be "flexible enough for the court to consider documentary evidence that would not meet the usual evidentiary requirements that apply to criminal trials," *Penn*, 721 F.2d at 764, but recognizes that absent traditional indicia of reliability or some other assurance that the hearsay is reliable, due process entitles a parolee to confront and cross-examine the source of the inculpatory hearsay evidence against him, *see Gagnon v. Scarpelli*, 411 U.S. 778, 782, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973).

### A. The reliability of the hearsay evidence

Before determining whether Ash's confrontation rights were violated, the Court must first assess the reliability of the hearsay evidence presented against Ash. The hearsay evidence against Ash consisted of 1) unsworn verbal allegations of "4 or 5" unidentified individuals who allegedly identified Ash as the attacker in the incident, 2) an unsworn verbal statement by Anthony Gardner implicating Ash in the assault, and 3) Simms' emergency room medical records describing the type and extent of his injuries.[4]

Respondents argue that the statements by the group of people who were pointing and screaming are reliable because the statements are "excited utterances." (Resp'ts Reply at 5–6.) Respondents concede that Anthony Gardner's statements lack any traditional indicia of reliability,

but argue that Ash was not prejudiced by the use of Gardner's statements in the parole revocation hearing because Gardner's statements are consistent with the reliable hearsay evidence (the excited utterances of the group) and the non-hearsay evidence (the medical records and Officer Shepke's personal observations). Petitioner disputes both that the statements by the group of people screaming "that's him" can be considered reliable as an "excited utterance," (Pet'r Br. at 10–14), and that Ash was not prejudiced by inclusion of either Gardner's statements or the statements of the several unidentified individuals (*id.* at 22–26).

Because a decision to revoke an individual's parole results in a deprivation of liberty, *Morrissey* and its progeny are primarily concerned that such decisions be supported by "verified facts" and "accurate knowledge." *Morrissey*, 408 U.S. at 484, 92 S.Ct. 2593. Thus, when hearsay is used to support a decision to revoke parole, there must be some independent basis for believing the hearsay to be true. The "indicia of reliability" sufficient to dispense with a parolee's confrontation rights are generally the same as those that support admissibility in a criminal trial, such as "affidavits, depositions and documentary evidence." *See Penn*, 721 F.2d at 765, *construing Gagnon*, 411 U.S. at 782, 93 S.Ct. 1756; *see also Bell*, 785 F.2d at 643 n. 2. "Unsworn verbal allegations," by contrast, are considered "the least reliable type of hearsay." *Comito*, 177 F.3d at 1171; *see also Taveras*, 380 F.3d at 537–38 (rejecting government's argument that hearsay was reliable under excited utterance exception and finding right to confrontation because unsworn verbal allegations were critical to revocation decision).

---

4. The parties agree that the medical records are considered reliable evidence under the hearsay exception for business records. *See* Fed.R.Evid. 803(6).

Where unsworn verbal allegations are important to the government's case in a parole revocation hearing, the parolee's "right to confrontation is at its apogee." *Comito,* 177 F.3d at 1171.

### 1. The hearsay of the several unidentified declarants

 Officer Shepke testified that as he arrived at 529 East 27th, he saw a group of "several people out in front of the address ... pointing in the street and screaming that that was him." (A. at 48.) Officer Shepke further testified that after he apprehended Ash and returned with him to the house, he was identified by 4 or 5 individuals.[5] (*Id.* at 51.) The Commission argues that the pre-arrest hearsay statements of these "several people" who screamed "that's him" and the post-arrest statements of some number of individuals who identified Ash as the perpetrator of the assault qualify as "excited utterances" and are therefore reliable. Excited utterances—statements made under the duress of a startling event and relating to that event—are considered reliable hearsay on the theory that the excitement "suspends the declarant's powers of reflection and fabrication." *United States v. Alexander,* 331 F.3d 116, 122 (D.C.Cir.2003) (*quoting United States v. Brown,* 254 F.3d 454, 458 (3d Cir.2001)).

 That the "several people" were "screaming" certainly indicates that they were in an excited state. A declarant's agitated state of mind is only reliable evidence of the truth of the statement, however, if the declarant actually witnessed the event. *See* Fed.R.Evid. 803 advisory com-

mittee's notes, 1972 proposed rules, ¶ 3 (all hearsay exception delineated in Rule 803 require firsthand knowledge); *see also Brown v. Keane,* 355 F.3d 82, 90 (2d Cir. 2004) (excited utterance exception requires evidence of personal knowledge); *United States v. Mitchell,* 145 F.3d 572, 576–77 (3d Cir.1998) (same); *Bemis v. Edwards,* 45 F.3d 1369, 1373 (9th Cir.1995) (same). Hearsay statements of unidentified declarants are not automatically precluded under the excited utterance exception. *See Miller v. Keating,* 754 F.2d 507, 510 (3d Cir. 1985). However, the party seeking to introduce such a statement is not relieved of the burden of demonstrating the declarant's personal knowledge of the event, a burden which naturally becomes more difficult to meet when the declarant is unknown. *Id.*

Respondents assert that "a fair reading of the record demonstrates that the people who made these excited utterances were the very people who witnessed petitioner stab Jerome Simms." (Resp'ts Reply at 4.) Respondents are incorrect. Neither the police report nor Officer Shepke's testimony establish that any of the individuals who pointed and yelled "that's him" personally witnessed Ash assault Simms. Officer Shepke wrote his report almost entirely in the passive voice, with virtually no attribution to any particular individual. The report makes statements such as, "interviews with the witnesses found that the Defendant (Mr. Ash) and Mr. Simms had a disagreement," (A. at 10), and "the Defendant (Mr. Ash) was seen returning to the kitchen," (*id.*), but says nothing about

---

5. Officer Shepke's testimony largely repeats the same hearsay incorporated into his police report, although his testimony is significantly more vague than the allegations in the report. However, the report says nothing about the emotional state of the "several people" who allegedly identified Ash. (*See* A. at 10.) The

police report merely states that "several people were in front of 529 East 27th pointing at the male running." (*Id.* at 10.) The report goes on to say that "the male was taken into custody, and was quickly identified by the witnesses as the suspect in the cutting." (*Id.*)

which individuals made those statements or whether they personally witnessed the events they described or were merely repeating second- or third-hand information. How many witnesses? What were their names? Did Officer Shepke interview all the witnesses or just some? Who said what? Who saw what?

■ An equally plausible reading of the record is that the group of people who were "in front of 529 East 27th pointing at [Ash]," (*id.*), heard some commotion from another room, or even from outside, and arrived in time to see Ash running down the street, but nothing more. Hearsay that is equally susceptible to the interpretation that the declarant was speculating or repeating information from another source does not bear sufficient circumstantial guarantees of trustworthiness to justify nonproduction of the declarant. *See Miller*, 754 F.2d at 511–12 (refusing to infer personal knowledge from unidentified declarant's exclamation "the bastard tried to cut in" at the scene of an automobile accident; equally likely that declarant was "hypothesizing or repeating what someone else had said"); *Brown*, 355 F.3d at 86, 90 (same for anonymous 911 caller reporting a shooting; equally likely that caller only heard gunshots and speculated as to the description of the shooter); *Bemis*, 45 F.3d at 1373–74 (upholding exclusion of 911 call because circumstances indicated caller may have been repeating statements of another individual); *cf. Jackson*, 323 F.3d at 129 (explaining that to the extent a police report may contain multiple layers of hearsay, its reliability is particularly suspect); *Bell*, 785 F.2d at 644–45 (finding police officer's hearsay testimony unrelia-

ble and noting presence of "double hearsay").

Respondents appear to believe that because the police report lists the names of some individuals who were at the scene, the Court may infer that these same individuals saw the alleged assault. According to the report, the following people were at the scene: Earline Gardner, Charlotte Gardner (Earline's sister), Earline Gardner (the mother of Earline Gardner), Anthony Gardner and Edwin Davis. (A. at 10.) However, neither Officer Shepke's report nor his testimony tie any of the statements of the "several" people who yelled "that's him" to any one or more of these individuals. At most, the Court might reasonably infer that some of the named individuals were also some of the same "4 or 5" people who yelled and pointed at Ash. The record is devoid, however, of any evidence whatsoever suggesting that any of these "several" people actually saw Ash assault Simms.[6]

Without some evidence to indicate that the unidentified group of "4 or 5 people" who yelled "that's him" actually saw the alleged assault take place, the Court is unwilling to shoehorn unsworn, verbal statements by some unspecified number of people into an excited utterance exception merely upon a showing of excitement. "[E]xcitement ... not coupled with knowledge of the event described adds nothing to reliability." *Brown*, 355 F.3d at 90.

■ The post-arrest statements made by some unidentified number of people suffer from the same deficiencies. Even if the witnesses were still in an excited state by the time police apprehended Ash and returned him to the scene, a fact not re-

---

**6.** Notably, at least four of individuals listed in Officer Shepke's report are also listed as witnesses at the Maryland state criminal trial on the assault charge. (A. at 23.) The court granted Ash a judgment of acquittal after the conclusion of the government's case in chief, raising additional concerns about the reliability and credibility of the "several" hearsay declarants.

flected in the record, the police report uses such vague and passive language as to make attribution of any allegation largely impossible. As noted above, the report makes statements such as "interviews with the witnesses found that the Defendant (Mr. Ash) and Mr. Simms had a disagreement," (A. at 10), "the Defendant (Mr. Ash) was seen returning to the kitchen," (*id.*). When asked at the hearing to give more detail about the witnesses with whom he had spoken and what they had said, Officer Shepke could not remember their names, (*id.* at 53), was uncertain as to their number ("4 or 5"), (*id.* at 51, 54), and admitted that he had not formally interviewed anyone other than Anthony Gardner, (*id.* at 50–51, 54–55).

The only individuals to whom the Court might possibly infer attribution are Anthony Gardner, Edwin Davis and Charlotte Gardner. The police report asserts that Anthony Gardner and Edwin Davis separated Ash and Simms and saw Ash "slashing back and forth on Mr. Simms' back and face." (*Id.* at 11.) The police report also states that Charlotte Gardner saw Ash drop a white-handled box-cutter. (*Id.*) Given Officer Shepke's inability to remember any details about the names, number or statements of the witnesses and his admission that he only interviewed Anthony Gardner, it seems equally possible that neither Edwin Davis nor Charlotte Gardner made any such statement to Officer Shepke, but that Anthony Gardner provided this information to Officer Shepke. Only after the hearing examiner asked Shepke if he had obtained any additional information in his conversation with Gardner at the hospital did Shepke provide these details describing an altercation in which Ash slashed back and forth across Simms' back and Gardner jumped in to stop the fight. (*Id.* at 57–58.)

Even if Charlotte Gardner and Edwin Davis are the declarants, however, the hearsay is nonetheless unreliable. First, the Court cannot infer from Charlotte's statement that she saw the entire incident. Indeed, it seems likely based on the statement that she came upon the fight just after it had ended. Furthermore, and more importantly, the report is silent regarding their emotional state at the time they allegedly made the statements, the "temporal gap between the event and the utterance," and their "age, motive to lie, and physical and mental condition." *See Alexander*, 331 F.3d at 122–23.

Finally, to the extent the hearsay is included in a police report or testified to by a police officer, its reliability is particularly suspect. *See Jackson*, 323 F.3d at 129 (expressing concern about the "dangers of relying on uncorroborated police reports" in parole revocation proceedings); *Bell*, 785 F.2d at 643–44 (explaining that police reports are inherently unreliable evidence of the truth of the allegations because of the "personal and adversarial" relationship between police officers and suspects).

The fact that the hearsay statements identifying Ash are largely unattributable to any particular person and may be double or triple hearsay is especially worrisome here, where some of the witnesses appear to be related and/or romantically involved. *See Comito*, 177 F.3d at 1171 (unsworn verbal accusations by parolee's ex-girlfriend involve the "least reliable form of hearsay"); *United States v. Fennell*, 65 F.3d 812, 813–14 (10th Cir.1995) (former girlfriend's unsworn allegations to probation officer lack even "minimal indicia of reliability"); *cf. Alexander*, 331 F.3d at 123 (listing declarant's motive to lie as a relevant factor in assessing reliability of statement under excited utterance exception).

The report states that Earline Gardner was Ash's "current love interest" and implies that Simms, who apparently has two children with Earline Gardner, got into an argument with Ash over Ms. Gardner. (A. at 10.) When questioned about the relationships between Ash and the witnesses and victims, however, Officer Shepke admitted that the information was "conflicting" and that he "still to this day do[es]n't have a solid idea of who was involved with who or what involvement with any of the victims were." (*Id.* at 56.) Officer Shepke believed that there may have been some romantic involvement between one of the witnesses and *either* Mr. Ash *or* one of the victims, but could not say with any certainty which parties were romantically involved:

Q: Did you learn of the relationships between Mr. Ash and any of the witnesses or the complaining witness?

A: I believe one of the females at the location may have been girlfriend/boyfriends with one or more of the victims or, Mr. Ash, and that's the best I can come up with. It seems to be going unclear in that area.... It was a very confusing chain of how or who was related to what. I never quite grasped it.

(*Id.*)

Even assuming that Ash and Earline Gardner were lovers and that Ash cut Simms with a box cutter, Simms' relationship with Earline Gardner raises serious questions about his role in the incident. It is possible that Simms had a grudge against Ash and attacked him, forcing Ash to defend himself. *See Morrissey,* 408 U.S. at 488, 92 S.Ct. 2593 (even where violation of parole conceded, a parolee is entitled to show, through direct evidence or cross-examination, "that circumstances ... suggest that the violation does not warrant revocation"). It is equally possi-

ble that the Commission is correct, and Ash attacked Simms. Unfortunately, the record is utterly unenlightening in this regard.

Nor did Officer Shepke's remaining testimony shed any additional light on the identities of the witnesses or their relationships. To the contrary, though Officer Shepke signed the police report which stated that "the witnesses" identified Mr. Ash as "the suspect," it appears Officer Shepke only did the most cursory of preliminary information gathering. (A. at 54.) Other detectives apparently interviewed the witnesses and took their statements at a later time. (*Id.*) Those statements, which are presumably more detailed and coherent, form no part of the report and were not used in the parole revocation hearing.

With the exception of Anthony Gardner, Officer Shepke was unable to specify in his testimony who was at the scene, what their relationships were to each other, whether they actually saw the incident or just the ensuing commotion, or even how many people there were exactly:

Q: [Y]ou indicated earlier that once Mr. Ash was arrested and taken back to the scene and positively identified, and you said he was identified by how many people?

A: At least 4 or 5. Everybody in the house that was there talking to him that was there (inaudible) or another and did indicate that he was the subject of the report.

. . . . .

Q: For the 4 or 5 people on the scene, did you write up statements?

A: I did not, because they were taken in and interviewed by detectives.

The concerns about the relationships among the various parties, and the lack of information about the circumstances of the

fight distinguish this case from *Crawford v. Jackson*, 323 F.3d 123 (D.C.Cir.2003). In *Jackson*, key facts were uncontested, including the fact that Crawford had been at home celebrating his birthday, that he was drunk, that he vomited inside the house, after which the complainant was injured. 323 F.3d at 130. The only contested issue, in fact, was the complainant's credibility. *Id.*

In *Jackson*, the police officer who investigated the scene observed deep, and bloody indentations in the walls that were consistent with the complainant's allegations that Crawford had slammed her against the living room wall several times. *Id.* Crawford offered no explanation for the bloody, indented walls, but instead asserted that the complainant had argued with a third person, left the house and injured herself climbing a fence. *Id.* The court in Jackson found that the "usual suspicion of second/third hand hearsay [wa]s considerably lessened" based on Crawford's "far-fetched explanation" for the complainant's injuries and his failure to offer any plausible explanation for the condition of the walls. *Id.* at 130–31.

The evidence in this case, by contrast, is not nearly so air-tight. Even assuming Gardner's statements (that he saw Ash slashing at Simms) to be true, the lack of information as to how the fight started, the uncertainty about what the various witnesses did or did not see, and the strong possibility of bias or a grudge on the part of the witnesses and/or victims in this case heighten rather than lessen the "usual suspicion of second/third hand hearsay." *Jackson*, at 130–31.

2. Anthony Gardner's Statements

 Anthony Gardner is the only individual whom Officer Shepke could identify by name in his testimony as having witnessed at least part of the incident. Officer Shepke testified that he spoke to Gardner at the hospital, and that Gardner told him that "he observed Mr. Ash making a slashing motion across Mr. Simms back and, when he tried to break them up, Mr. Ash's hand came across and cut him [Gardner] in the hand." (A. at 58.)

Like the statements of the unidentified several people, Anthony Gardner's statements are "unsworn verbal allegations," which are considered the "least reliable type of hearsay." *Comito*, 177 F.3d at 1171, *cited with approval in Jackson*, 323 F.3d at 129. Indeed, Respondents concede that Gardner's statements to Officer Shepke at the hospital are unreliable hearsay, but argue that the Commission's reliance on Gardner's allegations was not prejudicial. Additionally, Gardner's statements, which implicate Ash while minimizing his own role in the incident to one of a peacemaker, raise the possibility of bias. *See United States v. Huckins*, 53 F.3d 276, 279 (9th Cir.1995) (hearsay statements made by accomplice in course of plea negotiations lacked even minimal indicia of reliability). Gardner may well be telling the truth, but absent some traditional indicia of reliability, the Court has no basis for accepting his version of events.

B. Prejudice to Ash

 Respondents rightly conceded at oral argument that the Commission failed to make a good cause finding for its refusal to allow Ash to exercise his confrontation rights by cross-examining Simms, or, if not Simms, some other witness with personal knowledge of the event. Therefore, the Court will proceed to the final question, whether Ash was prejudiced by the hearsay.

 "Whether a witness's absence is prejudicial depends on the quality and quantity of nonhearsay and reliable hearsay evidence supporting the decisions to

revoke parole." *Ash*, 431 F.3d at 830. In other words, whether confrontation is Constitutionally mandated in a parole revocation hearing depends on the importance of the unreliable hearsay to the decision to revoke parole. *See Stanfield*, 360 F.3d at 1360 (district court's failure to balance parolee's right to confrontation against government's articulation of good cause was harmless error; hearsay evidence was largely duplicative of evidence already in the record without objection); *cf. United States v. Foster*, 986 F.2d 541, 543 (D.C.Cir.1993) ("the more important the witness to the government's case, the more important the defendant's right ... to cross-examine the witness").

Here, the hearsay statements identifying Ash as the attacker were critical to the Commission's decision; it was the only evidence that tied the Commission's case against Ash together. *See Taveras*, 380 F.3d at 538 (confrontation required where unsworn verbal allegations were critical to revocation decision); *Comito*, 177 F.3d at 1171 (same); *McBride v. Johnson*, 118 F.3d 432, 438 (5th Cir.1997) (parolee prejudiced by lack of confrontation where hearsay was critical); *Belk v. Purkett*, 15 F.3d 803, 808–09, 812–13 (8th Cir.1994) (rejecting government's lack of prejudice argument where hearsay accuser was "the most important adverse witness in th[e] case" and her hearsay statements bore little indicia of reliability).

The remaining evidence against Ash consists of the medical records describing Simms' injuries, Officer Shepke's personal observations of the group pointing at Ash and Ash running down the street and throwing an object over the fence, and other officers' recovery of a box cutter in the same area that Shepke saw Ash throw an object. Without the hearsay statements implicating Ash as the assailant,

this remaining evidence probably would not have been sufficient to independently sustain a decision to revoke Ash's parole. (*See* A. at 90–91.)

With respect to the medical records, both parties agree they are reliable, but disagree about the records' implications. Simms' emergency room medical records indicate that he had "multiple large slash wounds" extending across his entire back, measuring 40 cm in diameter, gaping and cutting deep into the muscle tissue. (*Id.* at 17.) The medical records also state quite definitively that Simms' wounds were caused by a "machete." (*Id.*) Ash argues that the nature of the wounds—large and gaping—and the conclusion that they were inflicted by a "machete" contradicts the Commission's theory of the crime, that Ash attacked Simms with a small box cutter. (Pet'r Br. at 9, 18–21.) Respondents, on the other hand, argue that the slash wounds described in the medical records are consistent with Gardner's statement that he saw Ash "slashing back and forth" across Simms' face and back.

Both parties are correct, making the medical records neutral at best. The Court takes judicial notice of the fact that a machete is commonly understood to be an extremely large weapon. The blade of a machete is typically 18 to 24 inches long.[7] If Simms or someone else speaking on his behalf did not identify the cause of Simms' injuries as a machete, then the doctors treating Simms presumably came to this conclusion as a result of their examination and treatment of Simms. The box cutter with which Ash allegedly assaulted Simms, by contrast, is quite small, approximately four or five inches including the handle. (A. at 53.) Assuming that the physicians who treated Simms inferred and were not

7. *See http://en.wikipedia.org/wiki/Machete.*

told that a machete caused Simms' wounds, it is certainly possible that they were mistaken.[8] The difference between a machete (or equally large weapon) and a four-inch box cutter is significant enough, however, to give the Court pause. More to the point, the Court is not at liberty to pick and choose portions of reliable business records that are inculpatory while discarding the parts that are exculpatory.

Of additional concern is the utter lack of any physical evidence implicating Ash in an assault when the circumstances of the crime suggest that the physical evidence should be overwhelming. Given the extent of Simms' injuries—deep and gaping wounds stretching across his back—his attacker (or at least the weapon) should have been covered in blood. There was no evidence, however, that any blood was found on the box cutter or on Ash himself. Officer Shepke could not remember whether he saw any blood either on the box cutter or on Ash, (*id.* at 54, 62), and the Commission did not offer any physical evidence.

Furthermore, forensic evidence was presumably available, since the crime lab came to the scene. (*Id.* at 11.) Officer Shepke testified that the box cutter was "maintained in place [where it was found]" until the crime lab arrived. (*Id.* at 62.) He could not remember whether the crime lab conducted any forensic testing, but did remember that the crime lab took photographs of the box cutter, (from which one could presumably see any bloodstains). (*Id.*) The Commission did not present these photographs at the hearing.

Officer Shepke's personal observations are equally unenlightening. Officer Shepke testified that he arrived on the scene and saw "several people out in front of the address . . . pointing in the street." (*Id.* at 48.) When Officer Shepke looked in the direction the people were pointing, he saw "a male running with a coat on." (*Id.*) Officer Shepke testified that he chased the male (Ash), apprehended him and brought him back to the scene. (*Id.*) Officer Shepke also testified that Ash "made a motion with his arm and threw an object over the fence." (*Id.* at 49.)[9] Two other officers, Officer Parker and Officer Morgan, arrived on the scene later. (*Id.* at 11.) They canvassed the area and recovered the white handled box cutter. (*Id.*)

Respondents appear to recognize that Officer Shepke's personal observations are insufficient, standing alone, as they attempt to recharacterize the hearsay statements of the "several" witnesses as something that Officer Shepke "saw." (Resp'ts Br. at 10.) As Petitioner rightly points out, however, unless the witnesses were using sign-language, the statements implicating Ash in an assault were communications that Officer Shepke heard, and are therefore hearsay. (Pet'r Br. at 9.) More to the point, the act of identifying Ash is a communication, no matter the medium. It is an accusation about one person's role in an incident that Shepke did not personally witness, and is therefore hearsay.

Finally, the Court takes note of the fact that a Maryland state court granted Ash a judgment of acquittal on the assault

---

8. The hearing officer believed that the doctors either made a mistake in "terminology," (A. at 79), or that "the statement [describing the weapon as a machete] may have somehow gotten misinterpreted at the time," (*id.* at 77.) The Court is not free to make such assumptions, however, as there is nothing in the

record to suggest that Simms' physicians were mistaken or that someone misinterpreted the word "machete."

9. The police report indicates that Officer Valerio was the only individual who saw Ash toss an object over the gate. (A. at 10.)

charges.[10] (A. at 21.) Anthony Gardner, Charlotte Gardner, Earline Gardner, Edwin Davis and Jerome Simms were all listed as witnesses at the trial, as were Officers Shepke, Valerio, McGann, Parker, Rowland and Detective Sexton. (*Id.* at.23–24.) Yet, at the close of the government's case, the Maryland state court granted Ash's motion for a judgment of acquittal. (*Id.* at 21.) Furthermore, unlike *Crawford v. Jackson*, 323 F.3d 123, 131 (D.C.Cir.) in which the Circuit rejected a parolee's argument that dismissal of the underlying criminal charges undermined the reliability of the hearsay used against him in his parole revocation proceedings, it appears that the acquittal in Ash's case may have been on the merits.[11]

If, as the Commission asserts, some four or five people saw Ash cut Simms with a box cutter, it should not be that difficult to provide at least one of those witnesses. If the Commission had offered even one sworn statement by one of the witnesses who was interviewed in greater detail by another officer, or the photographs of the box cutter which Officer Shepke testified exist, perhaps a new hearing would not be warranted. It did not.

The hearsay evidence offered against Ash presents a paradigmatic case for confrontation. "Hearsay evidence, which cannot be put the fire of cross-examination, can hide biases, leave inconsistencies, provide false impressions, be mistranslated, exaggerated and distorted." *Belk*, 15 F.3d at 813. Subject to confrontation and a more searching inquiry, however, the links may appear more tenuous. Here, with the exception of Anthony Gardner, whose unsworn verbal statements played down his own involvement in the incident but who may himself have been involved, the hearsay statements identifying Ash were made by some "4 or 5" people whose identities can be guessed at but are not known, who may or may not have actually seen the assault with which Ash is charged, who may or may not be repeating allegations second or even third hand, some of whom are related and one of whom had or has a romantic relationship with the victim. Under such circumstances, Ash's right to confrontation is at its "apogee." *Comito*, 177 F.3d at 1171.

Add to the inherent unreliability of the hearsay statements the fact that they were offered in the form of a police report, the lack of any physical evidence when such evidence was available, conflicting medical records and Officer Shepke's limited personal observations and this Court begins to seriously question the reliability of the case presented against Ash. Because the hearsay evidence was critical to the Commission's decision, Ash was unquestionably prejudiced by the lack of confrontation.

---

**10.** The Court's decision regarding Ash's confrontation and sufficiency of the evidence claims does not, in any way, rest on Ash's acquittal in state court. For one, it is impossible to know the precise basis for the judgment of acquittal without the trial transcript. Ash repeatedly sought copies of this information, but was unable to obtain it. (A. at 42–43.) The Court raises the issue merely to note that Ash's judgment of acquittal adds to its concerns about the reliability of the various hearsay declarants in Shepke's report and the accuracy of the charges against Ash.

**11.** In *Jackson,* the D.C. Superior Court had dismissed the aggravated assault charges for failure to prosecute and subsequently granted the defendant's motion to seal and expunge his arrest record. 323 F.3d at 127–28. The petitioner in Jackson argued that the dismissal and expungement undermined the reliability of the police report. *Id.* at 131. The court in *Jackson* disagreed because "the expunging court made no finding of fact" but, rather, granted the motion to expunge solely because the government failed to file an opposition. *Id.*

## II. Waiver

Finally, the Court rejects Respondents' argument that Ash's due process rights were not violated by the absence of Jerome Simms because Simms was either not an adverse witness and because Ash waived his right to confrontation by failing to request the presence of any other adverse witnesses at the parole revocation hearing. (Resp'ts Br. at 9; Resp'ts Reply at 11.) As an initial matter, Respondents already unsuccessfully raised this argument on appeal to the Circuit. See Ash, 431 F.3d at 828–29, 831 (remanding case for assessment of reliability of hearsay evidence notwithstanding Respondents' argument that Simms was not an adverse witness). Even if the Circuit's remand of this case cannot be viewed as disposing of the argument, Respondents are incorrect on the merits.

First, the Commission waived its right to argue that Simms was not an adverse witness when it approved Simms as an adverse witness at the probable cause hearing and subpoenaed him to appear at the parole revocation hearing. See McBride, 118 F.3d at 439 (parolee entitled to rely on parole authority's commitment to produce complainant at revocation hearing).

The Commission's regulations define an "adverse witness" as one who has "given information upon which revocation may be based." 28 C.F.R. § 2.101(b). According to Respondents, Simms is not an adverse witness because Simms was not the source of the hearsay on which the Commission relied. At the time of the probable cause hearing, however, Ash had every reason to believe that Simms was an adverse witness. Simms was the victim and complainant. The Commission provided Ash with Simms' medical records at the probable cause hearing and identified them as evidence that inculpated Ash. (See Petition-er's Br. at 27.) The Commission also presented with Officer Shepke's report, which makes a series of conclusory statements attributed only to "witnesses." Under the circumstances, it was eminently reasonable to assume that the victim and complainant in the case might have provided evidence about which Shepke would testify.

At the parole revocation hearing, the Commission agreed that Simms was an adverse witness, approved Ash's request and subpoenaed Simms. (A. at 30, 40.) Only after Simms failed to appear and multiple attempts to find him proved futile did the Commission attempt to argue, at the end of the revocation hearing, that Simms was not an adverse witness within the meaning of the regulations. (Id. at 37, 40, 76–77.) If the Commission believed that Simms was not an adverse witness, it had an obligation to so indicate at the probable cause hearing when Ash initially requested Simms' presence and not make a nunc pro tunc determination at the end of the revocation hearing. Allowing the Commission to engage in such bait and switch tactics would effectively eviscerate the right to confrontation guaranteed by Morrissey. Cf. Steagald v. United States, 451 U.S. 204, 210–11, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981) (rejecting government's request to remand case to determine factual issue of whether petitioner had a reasonable expectation of privacy in house that was searched, when government previously acquiesced in court's characterizations of search as one of petitioner's residence).

Finally, even if Simms is not an adverse witness within the meaning of the Commission's regulations, Respondents' argument fails because Ash did not waive his right to confrontation at the revocation hearing. The record clearly shows that when Simms failed to appear at the revocation hearing, Ash explicitly objected to

going forward without either Simms *or*, if not Simms, some other witness who gave information on which the Commission's allegations were based. (*See* A.39, 69–71.) The Court finds that Ash's request was more than sufficient to preserve his right to confrontation. *See Duckett v. Quick*, 282 F.3d 844, 848 (D.C.Cir.2002) (finding parolee had waived his right to confrontation only because record revealed that parolee had never, either at probable cause hearing or at revocation hearing, sought the presence of adverse witnesses); *Allston v. Gaines*, 158 F.Supp.2d 76, 80 (D.D.C.2001) (same); *McBride*, 118 F.3d at 438–39 (finding parolee had preserved his right to confrontation merely by questioning the witness' absence and objecting to hearsay testimony).

Accordingly, and for the reasons described in this memorandum opinion, Ash's petition for *habeas* relief is GRANTED.