**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
   *Plaintiff-Appellee,*

v.

WILLIAM LEWIS HALL,
   *Defendant-Appellant.*

No. 04-50193

D.C. No.
CR-01-01084-1-NAJ

OPINION

Appeal from the United States District Court
for the Southern District of California
Napoleon A. Jones, District Judge, Presiding

Argued and Submitted
February 18, 2005—Pasadena, California

Filed August 15, 2005

Before: A. Wallace Tashima, Kim McLane Wardlaw,
Circuit Judges, and Raner C. Collins, District Judge.*

Opinion by Judge Wardlaw

---

*The Honorable Raner C. Collins, United States District Judge for the
District of Arizona, sitting by designation.

**COUNSEL**

Mark F. Adams, San Diego, California, for the appellant.

Carol C. Lam, United States Attorney, San Diego, California, for the appellee.

## OPINION

WARDLAW, Circuit Judge:

We must decide whether the Sixth Amendment right to confront testimonial witnesses established in *Crawford v. Washington*, 541 U.S. 36 (2004), applies to the admission of hearsay evidence during revocation of supervised release proceedings.

## Factual Background

William Lewis Hall was on supervised release when, on October 26, 2003, Hall's probation officer, Janet Bergland, picked up a voice mail message from Susan Hawkins reporting that Hall had been drunk and had beaten her up the night before. Hawkins had attempted to file a police report, but the police had been preoccupied fighting forest fires in the area at the time.[1] Hawkins intended to go to the police department that day to file the police report. The message also indicated that Hawkins had gone to a domestic violence shelter, which, in turn, had sent her to St. Vincent de Paul's homeless shelter. As was her practice, and pursuant to office policy, Officer Bergland memorialized the voice mail message in her official chronological record of activities in Hall's case.

Also on October 26, Hawkins sought treatment at University of California San Diego ("UCSD") Medical Center for multiple bruises and scratches. Hawkins told her treating physician, Dr. Glover, that her live-in boyfriend had assaulted her the night before. Dr. Grover concluded that Hawkins "had contusions on her elbow, her chest and her back" and that

---

[1]*See* Louis Sahagun et al., *Southern California Firestorms; A Rampage of Firestorms*, L.A. Times, October 27, 2003, at 1A (describing the devastation caused by massive wild fires throughout Southern California, including closed highways and evacuations that diverted local manpower and resources).

these injuries were "consistent with [her] complaint that she had been assaulted by her boyfriend with an open hand." He prescribed vicodin and ibuprofen to alleviate her pain and advised her to file a report with the police. Hawkins provided the hospital with only her name and birth date; she did not disclose any additional identifying information.

On October 29, Officer Bergland called Hall to inquire about Hawkins. Hall told Officer Bergland that Hawkins is a "street person" and a "hooker"[2] that he had taken in. He claimed that she had come to his room the night of the 25th and wanted to use drugs. According to Hall, he said no, they argued, and he asked her to leave. Hall admitted that he slapped Hawkins once during the argument, but denied that he had been drinking that evening. He fell asleep before she left the room.

On October 30, Hawkins contacted the San Diego Police Department to file a domestic violence report. Officer Gross went to Saint Vincent de Paul's, where Hawkins was staying, to take the report. The only identification Hawkins gave Officer Gross was her name and social security number. Hawkins told Officer Gross that she had been living with Hall and that on the night of October 25th, she, Hall, and a man nicknamed "Red" were drinking in his room. She and Hall began to fight. Hall "slammed the heel of his left hand into her neck" and told Red to leave the apartment, which he did. After Red left, Hawkins told Hall that she wanted to get her stuff and leave. In response, Hall grabbed a golf club that he kept near the door and threatened to harm her if she attempted to leave the room. Over the next four hours Hawkins and Hall argued. During this time, Hall choked and battered her with the heel of his hand on three separate occasions. Hall also kept the phone away from Hawkins so she could not call the police.

---

[2]Officer Bergland investigated the assertion that Hawkins was a "hooker." She found that Hawkins had no criminal record or arrest for anything related to prostitution.

Hawkins told Officer Gross that she eventually agreed to stay to pacify Hall and then left after Hall fell asleep.

After hearing Hawkins' recitation, Officer Gross called in a female officer to photograph Hawkins' injuries. Officer Tagaban photographed the bruises on Hawkins chest, back, and elbow. The two officers went that day to Hall's apartment and arrested him. They found the golf club exactly where Hawkins said it would be.

On November 6, 2003, Officer Bergland petitioned the district court for a no-bail bench warrant alleging four violations of Hall's supervised release conditions: inflicting corporal injury upon his girlfriend, falsely imprisoning her, associating with a felon, Red, and failing to notify his probation officer of his law enforcement contact and subsequent October 30 arrest within 72 hours. The district court issued the bench warrant. Hall was arrested on the warrant on November 18, 2003, and arraigned. Hall denied each of the allegations of noncompliance. A revocation hearing was set for April 8, 2004.

Before the evidentiary hearing, Hall moved the district court to exclude "the hearsay statements of Susan Hawkins," under the balancing test set forth in *United States v. Comito*, 177 F.3d 1166 (9th Cir. 1999). The district court denied the motion. Three days later, the United States Supreme Court issued *Crawford*. Hall requested reconsideration of his motion to exclude Hawkins' hearsay statements, relying on the newly announced right to confront testimonial witnesses. The district court ruled that *Crawford*, which governs Sixth Amendment rights at trial, was not implicated by supervised release revocation proceedings. During the evidentiary hearing, conducted pursuant to Federal Rule of Criminal Procedure 32.1(b)(2), the government put on the five witnesses who had been in contact with Hawkins following the assault by Hall.

To summarize: Dr. Grover testified that he personally examined Hawkins. He found several contusions that were

consistent with her description of Hall's assault on her with an open hand. He also identified Hawkins from the photos taken by Officer Tagaban.

Officer Tagaban authenticated the photographs she took of Hawkins' injuries and testified that Hawkins had stated that the injuries resulted from her beating at the hands of her boyfriend. She also testified that she and her partner, Officer Gross, went to Mr. Hall's apartment and arrested him.

Officer Gross testified that on October 29th he was dispatched to "investigate a potential domestic violence incident" at the Saint Vincent de Paul Shelter. When he arrived at the shelter, he met Ms. Hawkins. Hawkins told him that she was living with Hall, that on the night of the 25th she was "in Mr. Hall's apartment drinking with Mr. Hall and another gentleman by the name of Red," and that during the evening Hall and Red had argued over the attention Red had been paying to Hawkins, which led to Hawkins and Hall's argument. Hawkins told Officer Gross that Hall "got upset, choked her, and hit her with his hand and knocked her to the bed." After the first assault, Hall told Red to leave, which he did. Hawkins then told Hall, "You know what? I don't want any more problems. I don't want any more issues. Why don't you let me get my stuff and I'll leave and we'll be done." Hall's response was to choke her and hit her again. Hawkins again said she wanted to leave, and Hall grabbed a golf club from behind the door and said, "I'm going to fuck you up if you leave."

Hawkins reported to Officer Gross that she was very afraid of Hall and concerned for her safety. She had attempted to call the police but Hall had taken the phone from her and there was no way to escape because Hall's second floor apartment had only one small window that lead to a courtyard. Eventually, she realized she could not argue her way out of the apartment so she told Hall, "You know what? I'm sorry. Let's make up. You know, all is forgiven. Let's start with a clean slate." This tactic worked. Hall hugged her and then

eventually he laid down and passed out, allowing Hawkins to gather her things and leave.

Officer Gross also testified that Hawkins provided him Hall's full name, a physical description, and his address. After leaving Hawkins, Officer Gross went to Hall's apartment where he arrested Hall and found the golf club behind the front door, exactly where Hawkins said it would be. The golf club itself was entered into evidence.

"Red," whose real name is Hubert Bystel Hall,[3] testified that he was in Hall's apartment the night in question. He said he saw Hall slap Hawkins and that he left the apartment shortly after Hawkins was hit.

Finally, Officer Bergland testified. All of Officer Bergland's testimony derived from her "chronals," written chronological entries kept by every probation officer as a regular part of their duties. Officer Bergland reported that she received a voicemail message from Hawkins stating that Hall had "gott[en] drunk the previous night and beat her up" and that the police "were too busy fighting fire to take a report." After getting the message, she testified that she called Hall. He told her that Hawkins was living with him and that they had argued and he slapped her.

Officer Bergland also testified that she had tried to contact Hawkins at the St. Vincent de Paul shelter, but was told that Hawkins' family had sent for her and she had left without leaving a forwarding address.

At the end of the hearing, the district court sustained allegations one and two of the Violation Petition, the domestic violence and false imprisonment allegations, revoked Hall's

---

[3]Hubert Hall has no relationship with the defendant. We refer to him by his nickname, "Red."

supervised release, and sentenced him to 24 months in custody.

## DISCUSSION

Hall contends on appeal that the admission of Hawkins' hearsay statements at his revocation hearing violated his Sixth Amendment right to confrontation as articulated in *Crawford*. As an alternative claim of error, Hall contends that even if we determine that *Crawford* did not give him an absolute right to confront Hawkins, a proper analysis of his due process rights under *Comito* would require exclusion of Hawkins' hearsay statements. We disagree.

## I. *Crawford* Does Not Apply to Revocation Proceedings.

[1] In *Crawford*, the Court held that the Sixth Amendment's Confrontation Clause gives criminal defendants the right to confront "testimonial" witnesses. 541 U.S. at 68-69. "Testimonial statements" include statements taken by police officers during their investigations, such as Hawkins' statements to Officer Gross. *Id.* at 52. Testimonial hearsay evidence may be admitted over the objection of the defendant only when the common law requirements of "unavailability and a prior opportunity for cross-examination" are met. *Id.* at 68.

[2] The Court derived this broad protection against testimonial hearsay evidence solely from the Sixth Amendment. *See id.* at 38 ("The question presented is whether this procedure complied with the Sixth Amendment's guarantee that, '[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him.' ") (quoting U.S. Const. amend. VI); *id.* at 61 ("Where testimonial statements are involved, we do not think the Framers meant to leave the Sixth Amendment's protection to the vagaries of the rules of evidence. . . ."). As the Court noted, the Sixth Amendment applies only to "criminal prosecutions." *Id.* at 38.

**[3]** We reject Hall's assertion that *Crawford* extends the Sixth Amendment right to confrontation to revocation of supervised release proceedings. "We begin with the proposition that the revocation of parole[4] is not part of a criminal prosecution and thus the full panoply of rights due a defendant in such a proceeding does not apply to parole revocations." *Morrissey v. Brewer*, 408 U.S. 471, 480 (1972). *See also Gagnon v. Scarpelli,* 411 U.S. 778, 782 (1973). Because "[r]evocation deprives an individual, not of the absolute liberty to which every citizen is entitled, but only of the conditional liberty properly dependent on observance of special parole restrictions" the full protection provided to criminal defendants, including the Sixth Amendment right to confrontation, does not apply to them. *Morrissey*, 408 U.S. at 480. Rather, a due process standard is used to determine whether hearsay evidence admitted during revocation proceedings violates a defendant's rights. *Id.* at 482.

**[4]** In *Crawford*, the Supreme Court addressed the Sixth Amendment rights of the accused in criminal prosecutions; it did not address the due process rights attendant to post-conviction proceedings for violations of conditions of release. *See* 2A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure Criminal § 412 (3d ed. 2000 & Supp. 2005). We, like the two circuits that have also addressed this question, see no basis in *Crawford* or elsewhere to extend the Sixth Amendment right of confrontation to supervised release proceedings. *See United States v. Aspinall*, 389 F.3d 332, 342 (2d Cir. 2004) (holding that *Crawford* does not apply to probation revocation because *Crawford* and the Sixth Amendment apply only to "criminal prosecutions" and "it has long

___

[4]Parole, probation, and supervised release revocation hearings are constitutionally indistinguishable and are analyzed in the same manner. *See United States v. Comito*, 177 F.3d 1166, 1170 (noting that the Supreme Court and the Federal Rules of Criminal Procedure have extended the same minimum due process rights to all three types of revocation proceedings).

been established that probation revocation, like parole revocation, is not a stage of a criminal prosecution") (internal quotations omitted); *United States v. Martin*, 382 F.3d 840, 844 n.4 (8th Cir. 2004) (holding that the confrontation right in criminal prosecutions does not apply to supervised release revocation proceedings because they are not part of a criminal prosecution).

## II.  Due Process and the *Comito* Balancing Test.

**[5]** Hall nevertheless enjoys a due process right to confront witnesses against him during his supervised release proceedings, as the Supreme Court held over thirty years ago in *Morrissey*. "Under *Morrissey*, every releasee is guaranteed the right to confront and cross-examine adverse witnesses at a revocation hearing, unless the government shows good cause for not producing the witnesses." *Comito,* 177 F.3d at 1170. To determine "whether the admission of hearsay evidence violates the releasee's right to confrontation in a particular case, the court must weigh the releasee's interest in his constitutionally guaranteed right to confrontation against the Government's good cause for denying it." *Id.*

We must "assess the significance of the releasee's interest in the right to confrontation." *Id.* at 1171. "The weight to be given the right to confrontation . . . depends on two primary factors: the importance of the hearsay evidence to the court's ultimate finding and the nature of the facts to be proven by the hearsay evidence." *Id.* Because the nature of the facts proven by Hawkins' hearsay statements, as well as its significance to each of the violations found by the district court differ, we must balance Hall's interest in confronting Hawkins separately for each sustained violation.

### A.  Domestic Violence Violation.

**[6]** Because the nonhearsay evidence introduced at the evidentiary hearing alone was sufficient to sustain the domestic

violence allegation, the hearsay evidence could not have significantly affected the court's ultimate finding. *Cf. United States v. Martin*, 984 F.2d 308, 311 (9th Cir. 1993) (finding a due process violation because the contested evidence was "uniquely important to the court's finding" and the district court "exclusively relied" on it in determining guilt). To convict Hall of inflicting corporal injury on his girlfriend, the court need only have found that Hall willfully inflicted "corporal injury resulting in a traumatic condition" on someone with whom he was cohabitating. *See* Cal. Penal Code § 273.5(a). Bruising is a "traumatic condition" for purposes of the statute. *People v. Beasley*, 105 Cal. App. 4th 1078, 1085 (2003) (finding bruising sufficient to sustain conviction under Section 273.5).

**[7]** The nonhearsay evidence at the hearing was substantial and sufficient to conclusively prove the domestic violence charge. Red testified that he was in Hall's apartment that evening and saw Hall hit Hawkins. Hall admitted to Officer Bergland that he was living with Hawkins and that he had hit her that evening. These facts, combined with the photographs taken by Officer Tagaban revealing Hawkins' bruises shortly after the incident were sufficient to sustain the domestic violence violation.[5]

**[8]** In addition, several pieces of evidence supporting the domestic violence allegation are admissible under hearsay exceptions. Although the Federal Rules of Evidence do not strictly apply to revocation hearings, *see United States v. Walker*, 117 F.3d 417, 421 (9th Cir. 1997), long-standing exceptions to the hearsay rule that meet the more demanding requirements for criminal prosecutions should satisfy the

---

[5]Thus, given that the domestic violence allegation was proven by nonhearsay evidence, even if the hearsay evidence should not have been admitted, any error was harmless as to this allegation. *See Comito,* 177 F.3d at 1170 (improper admission of hearsay testimony is subject to harmless error review).

lesser standard of due process accorded the respondent in a revocation proceeding. *See Morrissey,* 408 U.S. at 489 ("[T]he process [in revocation hearings] should be flexible enough to consider evidence . . . that would not be admissible in an adversary criminal trial.").

The medical records from Hawkins' hospital visit and the notes of Hall's parole officer were records kept in the ordinary course of business, classic exceptions to the hearsay rule. Fed. R. Evid. 803(6). Hawkins' statements to Dr. Grover, including that her live-in boyfriend had caused her injuries, were statements made for the purpose of medical diagnosis or treatment, and also hearsay exceptions. *See* Fed. R. Evid. 803(4) (describing as exceptions to the hearsay rule all "[s]tatements made for purposes of medical diagnosis or treatment . . . or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment").

**[9]** Hall's interest in excluding hearsay evidence relevant to the domestic violence allegation was thus weak, especially when weighed against the government's good cause for not producing Hawkins. *See infra* at 10637. *Cf. Comito,* 177 F.3d at 1171 (noting that the hearsay evidence was the only evidence provided for the contested element of the violation and therefore the releasee had "a very strong interest in demonstrating that the hearsay testimony did not reflect 'verified fact' ").

## B. False Imprisonment Violation.

**[10]** In contrast to the substantial nonhearsay evidence supporting the domestic violence charge, Officer Gross' account of Hawkins' statements regarding false imprisonment were undoubtedly significant to the court's ultimate finding. Under California law, false imprisonment is "the unlawful violation of the personal liberty of another." Cal. Penal Code § 236. The evidence of false imprisonment in this case primarily

comes from Hawkins' account of the evening as testified to by Officer Gross.

### 1) **Nature of facts to be proven by hearsay evidence.**

[11] The hearsay evidence relevant to the court's decision to sustain the false imprisonment allegation were the "[u]nsworn verbal allegations" of Hawkins to Officer Gross and are thus "in general, the least reliable type of hearsay." *Comito*, 177 F.3d at 1171. Unlike in *Comito*, however, Hawkins' statements bear indicia of reliability. Hawkins' statement to the police was supported by Gross' discovery of the golf club where she said it would be. Her statement is also corroborated by the consistency with which she reported the events of the evening to multiple people shortly after the incident, Red's testimony, Dr. Glover's medical conclusions, Hawkins' documented physical bruising, and even Hall's own statements to Officer Bergland. Finally, the reliability of the domestic violence aspect of her statements to the police gives credence to the rest of her account of the evening, including Hall's threats to injure her if she left the apartment. *See Martin*, 382 F.3d at 846 (finding, under the Eighth Circuit's balancing test, no due process violation, in part because the corroboration of the hearsay evidence made it inherently more reliable).

This is not the end of the inquiry, however. Simply because hearsay evidence bears some indicia of reliability does not render it admissible. *See Martin*, 984 F.2d at 313-314 (even urinalysis testing conducted by a laboratory is not sufficiently reliable to create a blanket rule that releasee has no interest in contesting the results). Hall's otherwise strong interest in confrontation is somewhat lessened by the reliability of the hearsay evidence, but it is not defeated.

Because Hall has a serious interest in confronting Hawkins as to the false imprisonment allegation, we must turn our attention to the other side of the scale to determine whether

the government had good cause in failing to produce Hawkins, and whether that good cause outweighs Hall's right to confrontation.

## 2) The government's good cause.

In determining the government's good cause in not producing a witness, we look to "both the difficulty and expense of procuring witnesses and the traditional indicia of reliability borne by the evidence." *Id.* at 312 (citation and quotations omitted).

[12] The government has provided a good reason for not producing Hawkins—despite substantial efforts to locate her, the government was unable to find her. Hawkins is a homeless woman who left the shelter where she was staying after the attack without leaving a forwarding address and has not been heard from since. Hall's probation officer tried to find her through the shelter. The government ran checks on Hawkins' social security number and birth date, the only identifying information it possessed, and were unable to locate her. The district court determined that the government had done all it could do to locate Hawkins. *See Martin*, 382 F.3d at 846 (finding that the government had good cause not to produce the witness because the witness refused to testify out of fear of retaliation by defendant).[6] This effort stands in stark contrast to cases where we have found that the government did not have good cause for failing to produce a witness. *See, e.g., Comito*, 177 F.3d at 1172 (noting that the witness was readily available to the government, was in contact with the defendant almost daily, and the government offered no explanation for not producing her).

---

[6]The difficulty of securing the testimony of domestic violence victims, like Hawkins, against their batterers is well recognized. *See* Tom Lininger, *Prosecuting Batterers After Crawford*, 91 Va. L. Rev. 747, 769 (2005) (citing research which showed that "the most common reason for dismissal of domestic violence prosecutions . . . was victims' failure to make court appearances or to testify against the defendants").

In addition, as discussed, the hearsay testimony regarding the false imprisonment bears some indicia of reliability. Hawkins statement to the police was supported by Gross' discovery of the golf club where she said it would be, the consistency with which she reported the events of the evening, the testimony of Red and Dr. Glover, the bruises on her body documented by the police photographs, and even Hall's own statements.

**[13]** Although Hall had a strong interest in confronting Hawkins with regard to the false imprisonment charge, on balance, that interest is outweighed by the government's good cause for not producing Hawkins as a witness and the independent indicia of reliability that support Hawkins' statements to Officer Gross.

## CONCLUSION

*Crawford* does not create a Sixth Amendment right of confrontation applicable to supervised release revocation or similar proceedings. Hall had a due process right to confront a testimonial witness which is not absolute. Balancing the *Comito* factors, we conclude that Hall had little interest in confrontation with respect to the domestic violence allegation because the hearsay evidence was insignificant to the ultimate finding. This minimal interest was outweighed by the government's substantial showing of good cause for not producing Hawkins at the hearing. Although Hall had a relatively strong interest in confronting Hawkins with respect to the false imprisonment allegation, his interest in confrontation on that allegation is outweighed by the government's good cause for failing to produce Hawkins at the hearing—both because the government made every effort to do so and because the hearsay evidence was substantially corroborated. For these reasons, Hall's due process rights were not violated and the final order of revocation is affirmed.

**AFFIRMED**.