**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

            v.

JANICE L. PEREZ,
            *Defendant-Appellant.*

No. 07-10289

D.C. No.
CR-98-00198-HG

OPINION

Appeal from the United States District Court
for the District of Hawaii
Helen Gillmor, District Judge, Presiding

Argued and Submitted
September 25, 2007—San Francisco, California

Filed May 16, 2008

Before: John R. Gibson,* Marsha S. Berzon, and
Carlos T. Bea, Circuit Judges.

Opinion by Judge Bea

---

*The Honorable John R. Gibson, Senior United States Circuit Judge for the Eighth Circuit, sitting by designation.

**COUNSEL**

Peter C. Wolf, Federal Public Defender, Matthew C. Winter, Assistant Federal Public Defender, Honolulu, Hawaii, for defendant-appellant Janice Perez.

Edward H. Kubo, Jr., United States Attorney, Tracy A. Hino, Assistant United States Attorney, Honolulu, Hawaii, for plaintiff-appellee United States of America.

**OPINION**

BEA, Circuit Judge:

We are called upon in this case to decide whether a person on supervised release has a right to cross-examine the laboratory technician who tested a urine sample containing an illegal drug, where: (1) the test report itself stated the sample was "dilute"[1]—meaning the urine sample had been combined with another liquid at some point before or during the testing; (2) the evidence presented showed the person on supervised release did not have an opportunity herself to dilute nor add

---

[1]"Dilute" means to "to make thinner or more liquid by admixture." Merriam-Webster's Online Dictionary http://www.merriam-webster.com (last visited April 23, 2008).

a substance to the sample; and (3) the result of the urinalysis was critical to support a finding that the person on supervised release had possessed or used illegal drugs. Because the illegal drug found in the tested sample could only have come from Perez's urine, an added substance, or another liquid, and because the validity of the urinalysis was the critical issue in determining whether Perez had used cocaine, we reverse the district court and hold the person on supervised release had a right to cross-examine the technician who handled and tested the sample. Absent such cross examination, the urinalysis should not have been admitted, and the consequent revocation of supervised release cannot stand.

We caution that this is an unusual case with unusual facts and should not be taken out of context. We do *not* hold that a releasee always has a right to cross-examine the technician who tested a urine sample. This is not a case where other evidence was offered in support of revocation, such as illegal drugs discovered in the possession of the releasee. Nor is this a case where multiple urine samples each tested positive. Here, the urinalysis report was the critical piece of evidence presented in support of the charge that Perez tested positive for cocaine. Although urinalysis results may often be sufficiently reliable evidence that the opportunity for cross-examination is unnecessary for due process purposes, *see United States v. Martin*, 984 F.2d 308, 313-14 (9th Cir. 1993), here the report itself showed the sample had been adulterated. Given that the sample was uncontestably adulterated, the test results were in fact ineluctably *un*reliable.

I

In 1998, Janice Perez pleaded guilty to bank robbery in violation of 18 U.S.C. § 2113(a). She was sentenced to a term of seventy-seven months imprisonment and three years supervised release.

Perez's term of supervised release commenced on March 8, 2007. Her release conditions required Perez to "follow

instructions of the probation officer" and to abstain from using alcohol or drugs not prescribed for her.

On March 15th, Perez wished to travel to Maui to see her gravely ill brother, who was on life support. After verifying her brother's condition, Perez's probation officer, Derek Kim, permitted her to go to Maui, but directed her to come to his office upon her return, provide her travel itinerary and submit to a drug test.

When Perez returned, she went to the probation office and submitted her travel itinerary, but left without taking a drug test. Kim telephoned Perez to ask why she did not stay to be tested; Perez told him she forgot because she was upset after learning her brother had been taken off life support that day and had passed away.

Kim already knew about her brother's death, and testified, "so when she told me she forgot because she was upset, you know, I didn't think anything of it other than the fact that, well, I could see that that's conceivable." Kim did not ask Perez to come back into the office that day for a drug test. Instead, Kim instructed Perez to come by the office for a drug test the following day (March 20), which she did. That test established there were no illegal drugs in Perez's system.

Kim then directed Perez to report to Freedom Recovery Services ("FRS"), the outside contractor the probation office uses to monitor persons on supervised release, to undergo FRS's orientation.

On March 21st, the day after she passed a urine test at the probation office, Perez duly reported to FRS. Even though Kim had not directed her to get tested, Perez voluntarily submitted to another urinalysis.

Mrs. Billee Schnaible, who worked at FRS, testified she observed Perez give the urine sample; neither Perez nor the

sample were ever out of Schnaible's sight. The bathroom used was specially equipped with mirrors allowing Mrs. Schnaible to observe Perez and ensure she did not have an opportunity to adulterate the sample. Mrs. Schnaible testified Perez did not adulterate or "dilute" the sample.

According to a dip-stick test, the sample tested positive for cocaine metabolites. Perez protested vigorously saying, "I just tested at my PO's [Probation Officer's] yesterday and I'm clean, I'm clean, it can't be." Mrs. Schnaible testified that their usual practice would have been to conduct another test, but she did not remember collecting a second urine sample or doing a second test.[2]

Later, Dennis Schnaible, another FRS staff member, testified that after Perez protested, Mrs. Schnaible "got another testing device, a new one, and dipped it into the same urine. And the results were the same." Mr. Schnaible then assured the lid was on tight so the sample would not leak during shipping, watched Mrs. Schnaible fill out a chain of custody form, and sent Perez's urine sample to Scientific Testing Laboratories, Inc. ("STLI") in Virginia.[3] STLI is the designated testing laboratory for U.S. Probation and Pretrial Services. According to Mr. Schnaible, no second urine sample was taken from Perez.

That same day, on March 21st, after Perez had been to FRS, she returned to the probation office. Kim was out of town, but Perez asked another probation officer named Robin DeMello to take a urine sample and test it for her; DeMello refused.

---

[2]There was no evidence one way or the other as to whether either of the Schnaibles adulterated the sample, although both testified and were cross-examined.

[3]No one suggests either Schnaible adulterated the urine sample.

Mr. Schnaible testified the testing method used by FRS is not always reliable, which is why FRS uses the laboratories at STLI. He recalled one time when the method used by FRS resulted in four samples testing positive for drugs, but when those samples were sent to STLI, three of them tested negative.

The STLI report showed Perez's sample tested positive for cocaine. It also recorded abnormally low readings for the presence of creatinine (a breakdown product of creatine, an important part of muscle, produced by one's kidneys) and the urine's specific gravity. The report stated the following: "Specimen Validity Status: DILUTE." Perez objected that the STLI urinalysis report was hearsay, but it was nonetheless introduced into evidence. No STLI employee testified regarding the urinalysis report.

Also over Perez's hearsay objection, Kim testified the low creatine and specific gravity values meant that "rather than drinking tons of water, or other types of liquid, that [the people at STLI] actually believe a dilute, meaning that it was a liquid which included some urine." That the sample was diluted means that it had been adulterated. It not only contained Perez's urine, it also contained another unknown liquid that had been combined with the urine. Kim then speculated that someone could produce a dilute sample by using a hidden container to pour adulterated urine into the sample cup.

Perez argued to the district court the urinalysis result must be rejected because the sample had been adulterated. Perez contended she could not have adulterated the sample because she had been under the vigilant eye of Billee Schnaible when she gave the sample. She also contended her adamance she had not taken drugs and her multiple attempts to provide an additional sample that same day—at both FRS and then at the probation office—cast doubt on the accuracy of the urinalysis. The government responded that the sample was still available for retesting.

The district court rejected Perez's argument, concluding Perez had no credibility because of a long history of dishonesty. The district court made it clear its adverse credibility determination was not based on any evidence Perez diluted her own urine; the only grounds cited by the district court were some vague references to prior bad acts of the defendant. It is noteworthy there was no evidence introduced at the revocation hearing of any such prior bad acts. Likewise, there was no statement by the district court that anything about Perez's demeanor or manner of testifying caused her to lose credibility in the district court's eyes.

The district court found Perez guilty of both charges in the Request for Course of Action, specifically finding that Perez: (1) "refused to submit to drug testing at the Probation Office on 3/19/2007 as instructed on 3/15/2007"; and (2) Perez's "urine specimen submitted on 3/21/2007 tested positive for cocaine."

## II

We have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742. We review the district court's decision to revoke a term of supervised release for an abuse of discretion. *United States v. Verduzco*, 330 F.3d 1182, 1184 (9th Cir. 2003). Whether a defendant has received due process at a revocation proceeding is a mixed question of law and fact we review de novo. *See United States v. Havier*, 155 F.3d 1090, 1092 (9th Cir. 1998). "A due process violation at a revocation proceeding is subject to harmless error analysis." *Verduzco*, 330 F.3d at 1184 (internal quotation marks omitted). We reverse.

## III

A district court may revoke a term of supervised release only if it "finds by a preponderance of the evidence that the defendant violated a condition of supervised release." 18 U.S.C. § 3583(e)(3); *see also Morrissey v. Brewer*, 408 U.S.

471, 484 (1972) (holding a revocation cannot stand on "erroneous information"); *United States v. Martin*, 984 F.2d 308, 310 (9th Cir. 1993) (holding a revocation of supervised release must be "based on verified facts"). Although this is a lower standard than the "beyond a reasonable doubt" standard required for a criminal conviction, there must still be credible evidence the releasee actually violated the terms of supervised release.

## A.

**[1]** With regard to the first count—that Perez "refused" to submit to drug testing on March 19th—there is no evidence Perez intentionally refused to be tested. True enough, Perez was ordered to submit to drug testing after her return from Maui, and she did not do so. The charge, however, was not "failure" to submit to testing, the charge was "refusing" to submit to testing. The only evidence regarding Perez's refusal was in her favor. She told Kim she forgot to stay for drug testing on March 19th *because her brother died that day*. Kim testified he verified the brother's death and consequently "thought nothing" of her failure to stay for drug testing when she dropped off her travel itinerary. He accepted her explanation as "conceivable." He did not ask her to come back into the office that day, and she did not refuse to do so. Further, she submitted to a drug test the very next day, and tested negative for the presence of drugs. Accordingly, there was no evidence from which the trial court could find it was more probable than not Perez "refused" to submit to drug testing.

## B.

With regard to the second count—that Perez's urine specimen submitted on 3/21/2007 tested positive for cocaine— although the admission of a urinalysis without the opportunity for cross-examination is not necessarily error, given the particular facts of this case, the admission of this evidence with-

out allowing Perez to cross-examine the laboratory technician was error.

**[2]** Admission of hearsay evidence in revocation of supervised release proceedings is governed by the Fifth Amendment right to due process. *See United States v. Hall*, 419 F.3d 980, 985 & n.4 (9th Cir. 2005). A "releasee is guaranteed the right to confront and cross-examine adverse witnesses at a revocation hearing, unless the government shows good cause for not producing the witnesses." *Hall*, 419 F.3d at 986 (internal quotation marks omitted); *see also* Fed. R. Crim. P. 32.1(b)(2)(C) (a releasee is entitled to "an opportunity to appear, present evidence, and question any adverse witness unless the court determines that the interest of justice does not require the witness to appear").

**[3]** In *Martin*, we construed this right "as requiring that a supervised releasee receive a fair and meaningful opportunity to refute or impeach the evidence against him in order 'to assure that the finding of a [supervised release] violation will be based on verified facts.' " 984 F.2d at 310 (citation omitted) (alterations in original). When evaluating the weight of the releasee's right, we examine, *inter alia*: (1) the importance of the evidence to the district court's ultimate findings; (2) the nature of the facts to be proven by the hearsay; and (3) whether the releasee had any opportunity to refute the evidence. *Id*. at 312.

Perez was consistently denied any opportunity to refute the urinalysis results. Not only was her request to give another sample on the same day rejected by FRS and the probation department, but the district court denied her request to cross-examine the technician. This meant that here, as in *Martin*, the releasee had a "virtually complete denial of any opportunity to refute the evidence." 984 F.2d at 311.

**[4]** The evidence established the following undisputed facts: Perez gave a urine sample. Mrs. Schnaible testified that

it was Perez's urine that was in the sample sent to STLI for testing, and also that Perez did not have any opportunity to adulterate the sample. Given the undisputed evidence in this record that Mrs. Schnaible was watching Perez the entire time, it cannot be said it is more likely than not that Perez was the one who diluted the sample. We also know the FRS testing method was unreliable. Mr. Schnaible so testified when he noted that previously they had sent four positive samples to the lab, only to have three of them test negative at STLI. The fact that FRS's analyses showed cocaine in the sample does not preclude the possibility that a foreign substance added at STLI was the source of the cocaine, given that we know FRS's tests are unreliable.

**[5]** By the time Perez's sample was tested at STLI in Virginia, the sample had been diluted with another liquid. We know this because the urine specific gravity and creatine levels were low. Under these circumstances, the government's offer to re-test the sample did not solve the problem with the adulteration of the sample. A re-test of the sample might tell us the foreign substance in the sample and whether it is a substance commonly found in a laboratory, or it might not. What a re-test will not tell us is: (1) how the foreign substance got into the sample; (2) who introduced the foreign substance into the sample; or (3) whether the foreign substance was the source of the cocaine metabolites.

**[6]** Perez had an obvious interest in cross-examining someone from the lab on, *inter alia*, the results of the report, the chain of custody of the sample once it arrived at STLI, their testing methodology, their findings, whether anyone there could have introduced the foreign substance into the sample, whether cocaine is stored at the facility, the ratio of the urine to the other liquid in the sample, the concentration of cocaine found in the sample, the time cocaine remains in a person's system, and the ways in which a sample could become "dilute." Although Perez had an opportunity to cross-examine the probation officer, Kim, who spoke to someone at STLI,

Kim did not have personal knowledge regarding anything that happened at the STLI lab in Virginia. The urinalysis and Kim's testimony that someone had attempted to dilute the sample were the only evidence offered to prove Perez's guilt. Thus, Perez had a strong interest in being able to confront the person who actually handled and tested the sample at STLI and who wrote the report.

**[7]** Balanced against the releasee's interest in cross-examining a declarant is the government's interest in not putting the declarant on the stand, including: (1) the expense or difficulty of getting the witness to the stand; and (2) the reliability of the evidence. *Hall*, 419 F.3d at 988. Because we know the evidence was ineluctably unreliable in this case, the government has a heavy burden to prove it could not have made the witness available for questioning. The court in *Martin* held even if there is a significant expense in bringing the declarant to testify, the government does not get credit for this factor if it failed to use an available substitute for live testimony, such as "affidavits, depositions, and documentary evidence." *Martin*, 984 F.2d at 313.

The government argues that because the laboratory technician was in Virginia and the hearing was in Hawaii, it would have been quite time-consuming and expensive to transport the witness to Hawaii for the hearing. Further, the government maintains the evidence was reliable because STLI was the national testing laboratory for the U.S. Probation Offices and U.S. pretrial offices, which shows it "has extensive experience in this area [and] its reports carry greater indications of reliability" than other hearsay evidence. *Martin*, 984 F.2d at 314. All this is true, but the fact remains the sample was labeled by STLI itself as adulterated. The government could have offered to allow Perez's counsel to depose the technician (including deposing the technician in person, by video-conferencing, or by telephone), or at least offered a detailed affidavit explaining the areas of possible cross-examination

noted above, which would have cost the government very little. It did neither.[4]

**[8]** The district court compounded this error by relying on Perez's previous violations to disbelieve Perez's denials of culpability, rather than on any evidence that Perez committed the acts alleged here. There was no evidence Perez herself diluted the sample. The only evidence in this case that relates to Perez actually makes it less likely she was the one who diluted the sample. Mrs. Schnaible testified she observed Perez give the sample and the sample was never out of Mrs. Schnaible's sight from the time Perez first gave the sample to the time it was sealed and mailed off to STLI.

**[9]** Further undercutting the district court's speculation about what might have happened, Perez immediately requested that FRS run another test. When FRS did not take another urine sample, Perez went straight from FRS back to the probation office, where she requested the probation office take another sample. We think it unlikely a guilty party would seek out scientific confirmation of her guilt.

A term of supervised release cannot be revoked unless there is actual evidence the person on supervised release committed the acts alleged in the charging instrument (in this case, the Request For Course Of Action). *See Morrissey*, 408 U.S. at 484 (holding a revocation cannot stand on "erroneous information"); *Martin*, 984 F.2d at 310 (holding a revocation of supervised release must be "based on verified facts"). District courts must be cautious not to use the releasee's prior crimes to find the releasee violated the terms of supervised release where there is no reliable evidence the releasee did so.

---

[4]We do not decide that this substitute for cross-examination would have satisfied due process. That determination would depend on what the affidavit said, who submitted it, why the possibility of a deposition or television appearance was rejected, and what opportunities were available to refute the affidavit. *See Martin*, 984 F.2d at 312-14.

**[10]** In criminal trials, evidence of other crimes is generally not admissible to prove action in conformity therewith. *See* Fed. R. Evid. 404(b). Evidence of prior convictions for crimes of dishonesty is admissible to attack the truthfulness of that witness, Fed. R. Evid. 609(a), but Perez did not testify. Even though the rules of evidence do not apply to revocation proceedings, the same logical fallacy exists—you cannot convict someone of a new offense based solely on their prior bad acts. It is clear the district court relied solely on prior bad acts by Perez instead of evidence in this case. For instance, even though Perez did not testify in this proceeding, at one point the district court exclaimed, "Her credibility is in the minus figures [and] If she told me it was daylight, I would go open the window and check."

**[11]** Finally, the error here could not have been harmless because the urinalysis was the only actual evidence used to revoke Perez's supervised release. *See Hall*, 419 F.3d at 987 n.5. Accordingly, Perez's interest in cross-examining the laboratory technician so outweighed the government's interest in not producing the witness that the admission of the hearsay evidence violated her Fifth Amendment constitutional right to due process. *See Martin*, 984 F.2d at 314.

The revocation of Perez's supervised release is reversed and judgment is rendered in favor of Perez. If Perez has not already been released, the district court is instructed to vacate its finding she violated the terms of supervised release, order her immediate release from any prison term imposed for the claimed violation of supervised release, and enter an order in accordance with this opinion.

**REVERSED.**