**NOT FOR PUBLICATION**

FILED



MAR 20 2017

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 15-10043 |
| Plaintiff-Appellee, | D.C. No. 3:12-cr-08082-JAT-1 |
| v. | |
| WILLARD JOHN, | MEMORANDUM[*] |
| Defendant-Appellant. | |

Appeal from the United States District Court
for the District of Arizona
James A. Teilborg, District Judge, Presiding

Argued and Submitted July 6, 2016
San Francisco, California

Before: BERZON, and N.R. SMITH, Circuit Judges, and ZOUHARY,[**] District Judge.

Willard John appeals his jury conviction and life sentence for federal second-degree murder. We affirm.

---

[*] This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36-3.

[**] The Honorable Jack Zouhary, United States District Judge for the Northern District of Ohio, sitting by designation.

1. The district court did not err in denying John's motion to suppress his statements to the investigating agent. We review de novo whether a confession was made voluntarily, but we review "the district court's factual findings underlying its determination of voluntariness" for clear error. *United States v. Gamez*, 301 F.3d 1138, 1144 (9th Cir. 2002). Whether a confession was made voluntarily is determined by "'whether [the] defendant's will was overborne' by the circumstances surrounding the giving of [the] confession." *Dickerson v. United States*, 530 U.S. 428, 434 (2000) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)).

The district court did not clearly err in determining that, although John was unable to speak when the agent questioned him, John was alert and oriented during the time of the interviews. John's doctor testified that John was alert and oriented on the days of the interviews. The agent testified that, before he questioned John, he asked the nurse what medications John was taking and the nurse said John was not taking any medications that would alter his thinking or make him sleepy—that he was fully able to communicate. The agent also testified that John appeared alert and coherent during the interviews. The agent testified that John "was writing

2

notes" and, "although he couldn't speak, [they] were communicating just fine without any problems."[1]

Thus, given these facts, we cannot conclude that the district court erred in finding that John's statements to the agent were made voluntarily; that his will was not overborne by the circumstances surrounding the confession. *See Dickerson*, 530 U.S. at 434.

2.  The district court did not abuse its discretion by denying John's motion for a continuance in response to the government's disclosure of its report concerning the DNA evidence on the eve of trial. John had moved for a continuance or, in the alternative, to exclude the report. The district court denied the continuance and granted John's alternative motion to exclude the report. The district court

---

[1] Further, at the first interview, after John asked if it would be possible to sign the Miranda form at a later date, the agent asked John if he wanted to continue talking and John answered "yes." The agent also confirmed that John wanted to talk with him at the second interview. Although the dissent concludes John's written statement "consisted primarily of [the agent] describing a particular version of events and asking John whether it was accurate," Dissent at 2, the record reflects that John clarified and gave specific information to the agent, provided information that was not first suggested by the agent, and provided examples to support his statement. The agent testified that the statement was "based exactly on what we communicated with each other as [John] nodded and shook his head and wrote many, many notes." Further, contrary to the view of the dissent, it would not have been "exceptionally difficult" for John to shake his head "no" when he was asked whether the statement was accurate and whether he agreed with it.

3

explained that the government did not have exclusive control over the DNA evidence, and that John could have tested the DNA evidence himself and prepared his own report, but did not. Further, any potential prejudice that would have resulted from the government's use of the report was ameliorated by the district court's decision to grant John's alternative request to exclude the report.

3.     The government did not violate John's due process rights by failing to preserve potentially exculpatory evidence from the crime scene. For the government's destruction of evidence to rise to the level of a due process violation, John must prove "that the government acted in bad faith, the presence or absence of which 'turns on the government's knowledge of the apparent exculpatory value of the evidence at the time it was lost or destroyed.'" *See United States v. Sivilla*, 714 F.3d 1168, 1172 (9th Cir. 2013) (quoting *United States v. Cooper*, 983 F.2d 928, 931 (9th Cir. 1993)). Whether the government acted in bad faith is a factual finding determined by the district court, which we review for clear error. *Id.*

The district court did not clearly err in finding that the government did not dispose of the potentially exculpatory evidence in bad faith. The district court noted that John "scantly" argued the element of bad faith when John claimed that the government had failed to preserve the evidence. John argued before the district court that "[t]he FBI deliberately gave the evidence away, knowing it would be

4

destroyed." The district court found that this did not rise to the level of bad faith, because the investigating agent "specifically collected a blood sample from the top of the mattress and cut-out the bloody fingerprints on the underside, thereby preserving the most relevant portions of the mattress prior to its destruction." The district court further found that the agent "credibly testified that he did not believe that the remainder of the mattress constituted potentially exculpatory evidence, in part because the lack of evidence of an intruder and the fact that the mattress undeniably had been saturated with [John's] and [the victim's] blood."

As to the government's failure to preserve the photographs of John's injuries, the government did not violate John's due process rights. The district court did not clearly err in finding that John's argument with respect to the photographs was moot. John's injuries were not at issue. Further, thumbnail-sized images of the photographs were preserved and admitted into evidence.

4.      The district court did not abuse its discretion by denying John's request for an adverse inference instruction with respect to the lost evidence. A defendant may be entitled to an adverse inference instruction even if the government did not act in bad faith, but only when the quality of the government's conduct was poor and the prejudice to the defendant was significant. *Sivilla*, 714 F.3d at 1173–74. Here, the government's conduct in handling the evidence was not poor, and John was not

significantly prejudiced. As explained above, the government collected a blood sample from the top of the mattress and preserved a cut-out of the mattress before disposing of it. Additionally, the photographs of John's injuries were preserved via the thumbnail-sized images. Thus, any resulting prejudice was insignificant.

5. The district court did not plainly err in admitting the victim's statements to her physical therapist, because such statements were "reasonably pertinent" to medical diagnosis and treatment and described the "inception" and "general cause" of her injuries. *See* Fed. R. Evid. 803(4). Although the dissent notes this hearsay exception does not generally extend to "statements of fault," both this Court and at least one sister Circuit have held to the contrary in the context of domestic violence cases. *See United States v. Hall*, 419 F.3d 980, 986 (9th Cir. 2005) ("Hawkins' statements to Dr. Grover, including that her live-in boyfriend had caused her injuries, were statements made for the purpose of medical diagnosis or treatment, and also hearsay exceptions."); *United States v. Joe*, 8 F.3d 1488, 1495 (10th Cir. 1993) (holding doctor's testimony admissible under Federal Evidence Rule 803(4) where "the identity of the sexual assailant was important for his recommendation regarding Ms. Joe's after-care, including appropriate counseling"). The dissent further suggests that statements regarding the identity of an abuser are only admissible under this exception when necessary to treat emotional or psychological

6

injuries related to the abuse. That is the case here. As in *Joe*, the victim and her medical provider discussed her future safety, and the physical therapist "offered help" in seeking protection from her abuser. This conversation took place during the victim's physical therapy session. It is therefore admissible as "reasonably pertinent" to her treatment for the injuries she sustained.

6.     The district court's admission of the roommate's statement to the officer did not violate the Confrontation Clause, because the roommate testified at trial and was subject to cross-examination. *See Padilla v. Terhune*, 309 F.3d 614, 621 (9th Cir. 2002). Moreover, the district court instructed the jury that the officer's testimony regarding the roommate's statement could be "considered for impeachment purposes only and not as substantive evidence."

7.     The district court did not abuse its discretion when it admitted prior act evidence of John's physical abuse of the victim. The court admitted the evidence, because it was relevant in demonstrating that John had the "motive, opportunity, [or] intent" necessary to commit the crime. Fed. R. Evid. 404(b)(2); *see also United States v. Chea*, 231 F.3d 531, 534 (9th Cir. 2000) (explaining that Rule 404(b) is "one of inclusion" in that "other acts evidence is admissible whenever relevant to an issue other than the defendant's criminal propensity" (quoting *United States v. Mehrmanesh*, 689 F.2d 822, 830 (9th Cir. 1982))). Furthermore,

the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice, because the district court instructed the jury, both during and at the end of trial, that such evidence was "admitted only for the limited purpose of proving [John's] intent, motive, opportunity, preparation, plan, knowledge, identity, absence of mistake, or absence of accident, and, therefore, [must be considered] only for that limited purpose and not for any other purpose." *See* Fed. R. Evid. 403, 404(b)(2). Finally, even if the district court erred in admitting the evidence pursuant to Rule 404(b), the error was harmless. *See United States v. Hodges*, 770 F.2d 1475, 1480 (9th Cir. 1985) (holding an error is harmless if "it is more probable than not that the erroneous admission of the evidence did not affect the jury's verdict").

8.    The prosecutor did not commit misconduct during closing argument. We review John's claims of prosecutorial misconduct for plain error, because John failed to object at trial. *See United States v. Moreland*, 622 F.3d 1147, 1158 (9th Cir. 2010). We can reverse a conviction under this standard only if, "viewed in the context of the entire trial, the impropriety seriously affected the fairness, integrity, or public reputation of judicial proceedings, or where failing to reverse [the] conviction would result in a miscarriage of justice." *United States v. Geston*, 299

F.3d 1130, 1135 (9th Cir. 2002) (quoting *United States v. Tanh Huu Lam*, 251 F.3d 852, 861 (9th Cir. 2001)).

First, the prosecutor did not err in arguing that "[t]here is no way the murderer could have left [the] scene without leaving tracks [of blood] behind," because prosecutors are permitted to make reasonable inferences from the evidence during closing argument. *See United States v. Cabrera*, 201 F.3d 1243, 1250 (9th Cir. 2000). Furthermore, the district court specifically instructed the jury that they were to decide the case based on the evidence presented during trial and not on the attorneys' arguments. Thus, even if the prosecutor did misstate the evidence, such error was harmless. *See Fields v. Brown*, 503 F.3d 755, 782 (9th Cir. 2007) (en banc) (finding that jurors are presumed to follow the court's instructions).

Second, the prosecutor criticized only the defense's theory by calling it a "red herring," a proper practice in closing argument. *See United States v. Sayetsitty*, 107 F.3d 1405, 1409 (9th Cir. 1997) ("Criticism of defense theories and tactics is a proper subject of closing argument.").

Lastly, the prosecutor did not improperly comment on John's silence. The prosecutor argued that

> [I]f somebody else did this, why didn't [John] say that [to the investigating agent]? Why didn't he say that? He had not one, but two opportunities, at lengthy interviews with [the agent] . . . . If somebody

else did this, he would have said so. He would have told [the agent] that. But he didn't.

John had communicated at length with the investigating agent on two separate occasions. Thus, when "viewed in the context of the entire trial," the prosecutor's statements were not made in regard to John's silence, but rather to the implications of John's statements to the investigating agent. *See Geston*, 299 F.3d at 1135 (citation omitted); *see also Leavitt v. Arave*, 383 F.3d 809, 827 (9th Cir. 2004) (per curiam) ("[W]hen a defendant chooses to speak, the prosecutor can, surely, explore that speech and its implications.").

9.     The district court did not plainly err in failing to instruct the jury on "absence of heat of passion" as an element of second-degree murder. Because John's theory of the case was that he did not kill the victim, the evidence did not support giving a heat-of-passion instruction. John made no argument relevant to the instruction and did not request that the instruction be given. *See United States v. Roston*, 986 F.2d 1287, 1290 (9th Cir. 1993) ("The prosecution is required to negate a killing in the heat of passion only if that issue is 'properly presented in a homicide case.'" (quoting *Mullaney v. Wilbur*, 421 U.S. 684, 704 (1975))).

10.     John's life sentence was not unreasonable. Because John argues for the first time on appeal that his life sentence was unreasonable, we review for plain error. *See United States v. Waknine*, 543 F.3d 546, 551 (9th Cir. 2008).

The district court did not err procedurally, because the district court explained its reasoning and based the increase to a life sentence on U.S.S.G. § 5K2.8, "Extreme Conduct," and other factors, as permitted by 18 U.S.C. § 3553(c)(2).

The district court's upward departure under U.S.S.G. § 5K2.8, "Extreme Conduct," was not substantively unreasonable, because John's conduct was unusually heinous. The medical examiner found that the victim suffered multiple lethal wounds, including a slashed throat that cut through to the spine and two deep stab wounds to her back. She also suffered numerous other wounds, including seven other stabs wounds to her back and multiple cuts to her arms and side of her head.

Furthermore, the district court's upward departure to arrive at a life sentence was not substantively unreasonable. The district court chose to only depart upward two levels under U.S.S.G. § 5K2.8, though it could have gone further. The district court stated that "these [heinous acts] would all justify . . . a four-level upward departure [under U.S.S.G. § 5K2.8] to offense level 42," which would have

11

resulted in a range of 360 months to life. However, instead of imposing a four-level upward departure under U.S.S.G. § 5K2.8, the district court "elected to adopt [a] criminal history category III [from category I] and a two-level upward departure [under U.S.S.G. § 5K2.8] to offense level 40," which the district court noted also resulted in a range of 360 months to life.

On appeal, John argues that the district court erred by jumping from criminal history category I to III, because the district court had no basis for doing so under the Guidelines. We review a district court's upward departure from the Guidelines under U.S.S.G. § 4A1.3 for an abuse of discretion. *Koon v. United States*, 518 U.S. 81, 98–100 (1996). Under this standard, we may reverse the district court's decision only if we are "convinced firmly that the [district court's] decision lies beyond the pale of reasonable justification under the circumstances." *Harman v. Apfel*, 211 F.3d 1172, 1175 (9th Cir. 2000).

The district court did not abuse its discretion by departing upward to impose a life sentence. The district court based its decision on the "grossly underrepresented" criminal history, on the "especially cruel and heinous and brutal" murder, and on John's long history of abusing and assaulting the victim. The revised Guidelines range for a life sentence was based on specific and general deterrence factors to prevent similar crimes in the future. The district judge stated

12

that he had "absolutely no confidence that upon release [John] won't revert to the same patterns that he displayed over such a long period of time. So I'm satisfied that protection of the public requires this sentence."

**AFFIRMED**.

*__United States of America v Willard John  15-10043__*

BERZON, Circuit Judge, dissenting:

I respectfully dissent.  I would hold that John's statements to Special Agent

Hale in the hospital were not voluntary, and should not have been admitted into

evidence;  that the Federal Rules of Evidence barred the admission of testimony

regarding John's previous acts of domestic violence; and that the Rules also barred

the admission of Norma Jean Henry's out-of-court statement to her physical

therapist identifying John as her abuser.  Taken together, these errors seriously

undermined the fairness of John's trial.  I would therefore reverse the conviction.

1.      The district court erred in concluding that John's confession was

voluntary.[1]  When Hale first interviewed John in the hospital, John had a tube in

his throat and was unable to speak.  He was heavily medicated and in considerable

pain. When invited to sign a form waiving his *Miranda* rights at the first interview,

John inquired in writing if it would be possible to sign it at a later date.  As

recounted by Hale, John's initial responses at the second interview indicated that

John was still "not quite ready right now" for an interview, and that he would have

preferred to "talk later when [his] voice [was] a little better."  John also wrote "Can

I wait tell [sic] I get my voice back then we can talke [sic]."  Taken together,

---

[1] We review the voluntariness of a confession de novo.  *United States v. Gamez*, 301 F.3d 1138, 1144 (9th Cir. 2002).

John's written statements and responses to Special Agent Hale's prompts make clear that John did *not* wish to proceed with the interrogation under the circumstances, and desired to continue the interrogation only when he was capable of talking.

John's initial written statement was suggested *to* John, rather than volunteered; it consisted primarily of Hale describing a particular version of events and asking John whether it was accurate, to which John nodded yes or no. Given John's inability to speak, it would have been exceptionally difficult for him to object to or clarify any aspects of Hale's account. Indeed, during the second interview, John stated that "I think all [sic] go with the statement you wrote because I don't even know what had happened that night," indicating acquiescence rather than agreement.

Notably, John's statement includes obvious inaccuracies or confusion. For example, he stated that he had consumed over 30 cans of beer on the day of the killing, but his blood-alcohol concentration indicated that he had not been drinking heavily. Adoption of "demonstrably false" answers constitutes "particularly strong evidence" of suggestibility. *United States v. Preston*, 751 F.3d 1008, 1025 (9th Cir. 2014) (en banc).

The facts of this case somewhat resemble those in *Mincey v. Arizona*, 437

U.S. 385 (1978). In *Mincey*, government agents interviewed the defendant while he was in the hospital suffering from a serious gunshot wound. When interviewed, Mincey, like John, was unable to talk; responded to questioning by writing answers on pieces of paper; and stated that he would be able to answer more accurately at a future date. Mincey was "evidently confused and unable to think clearly," as evidenced by written answers which were "on their face not entirely coherent." *Id.* at 398–99. The Supreme Court held that Mincey's will "was simply overborne," and that his statements could not be used against him at trial. *Id.* at 401–02.

Mincey, unlike John, unequivocally invoked his right to counsel. And here, the district court found that John's ability to think clearly was not impaired. But John's statements – comprised predominantly of assertions made by Special Agent Hale, to which John merely agreed by nodding his head – were in some respects *less* a product of free will than Mincey's own written statement, and, while not incoherent, were in part factually suspect.[2] I would therefore hold that the district court erred in admitting John's statements to Agent Hale.

---

[2] The prosecution emphasized John's statement in its closing argument, contending that while John had two opportunities to "speak" to Special Agent Hale, he did not state at the time that another person had committed the crime, as he would argue at trial. Thus, the government used John's statements not only for what John "said" to Special Agent Hale, but what he did *not* say, in spite of his inability to speak and his professed difficulty in remembering the incident.

3

2.    Next, I would conclude that the district court abused its discretion in permitting testimony from nine separate witnesses regarding John's previous incidents of domestic violence against Henry over a "12-year period of abuse." Federal Rule of Evidence 404(b) states that evidence of prior acts "is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character," but may be admissible "for another purpose, such as proving motive, opportunity, [or] intent."[3]

Notably, the government essentially acknowledged in its pretrial briefing that it intended to rebut the defense's theory of the case by arguing that John acted in conformity with a violent predisposition: "The defendant's prior acts of violence against the victim show that it was the defendant, and not some third party intruder who killed the victim." The government similarly argues on appeal that the evidence was necessary to "show Defendant's identity as the perpetrator." These arguments rest on precisely the type of predisposition inference that Rule 404(b) is intended to preclude.

The majority holds that evidence of John's prior bad acts was admissible at

---

[3] If the proffered evidence falls into one of these categories, the advisory notes to Rule 404(b) instruct the district court to make a determination as to "whether the danger of undue prejudice outweighs the probative value of the evidence" under Rule 403.

trial because it helped to prove "motive, opportunity or intent." We have held that previous acts of domestic violent may evince an intent to murder the victim of those prior acts. *See United States v. Lewis*, 537 F.2d 415, 418–419 (9th Cir. 1987). I would hold *Lewis* inapposite for two reasons. First, as we emphasized in *Lewis*, the relevant prior acts must be "close enough in time to be relevant" to prove intent. *Id*. at 419. That cannot be said of much of the prior-act evidence in this case. For example, the testimony of McDaniel John (to which Willard John objected at trial) concerned acts of violence at least nine years before Henry's death. Second, the defendant in *Lewis* had admitted to previous acts of violence against the victim, bolstering our conclusion in that case that the evidence was not overly prejudicial to the defendant. Here, the government called *nine* witnesses to testify to John's previous abuse of Henry, to which he did *not* admit at trial. The prejudice of such voluminous testimony almost surely outweighed any probative value with respect to intent.

3. Lastly, I would hold that the district court plainly erred in admitting Henry's out-of-court statement to her physical therapist identifying John as the cause of injuries to her face and body. That statement was definitely inadmissible hearsay, as it did not fall within the exception of Federal Rule of Evidence 803(4).

The advisory note to Rule 803(4) cautions that "statements of fault"

5

ordinarily do not fall under the rule's exception for statements made for medical diagnosis or treatment. Such a statement of fault may be admitted in one limited circumstance: when the statement identifies a sexual abuser. *United States v. Yazzie*, 59 F.3d 807, 812 (9th Cir. 1995). "Sexual abuse involves more than physical injury; the physician must be attentive to treating the victim's emotional and psychological injuries, the exact nature and extent of which often depend on the identity of the abuser." *United States v. George*, 960 F.2d 97, 99–100 (9th Cir. 1992). No sexual abuse was at issue here. More importantly, a *physical therapist* would not be expected or trained to treat emotional or psychological injuries. The *identity* of an abuser would thus not be relevant to the physical therapist's diagnosis or treatment. *United States v. Hall*, 419 F.3d 980, 987 (2005) is not to the contrary, as the relevant statement in *Hall* was made to a physician, who could reasonably be expected to treat emotional and psychological injuries.

For the foregoing reasons, I respectfully dissent.